UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---------------------------------------------------)
UNITED STATES OF AMERICA,        )
                                 )
vs.                              )    CRIMINAL ACTION
                                 )    NO. 04-40019-FDS
ALEXIS MORALES,                  )
         Defendant               )
---------------------------------------------------)

**DEFENDANT'S SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF MOTION TO SUPPRESS EVIDENCE**

**STATEMENTS OF FACTS**

On June 7, 2004 Officers Vo, Lopez, Panarello, and Carmody were on "routine motor patrol" in the area of Plumley Village in Worcester, MA. (1:8-9).[1] Officer Carmody was in the backseat of an unmarked Ford Taurus seated behind the driver. (1:9). The Ford Taurus was traveling on Laurel Street. Laurel Street is a two-way road that is on a hill; it runs down the middle of Plumley Village with housing on either side. The officers proceed down the hill at a "steep" angle. To the left was 29 Laurel Street and an open courtyard. To the right was more housing and a convenience store. As the Taurus traveled down the hill, Officer Carmody saw a white Mercury Mountaineer traveling on Laurel Street in the opposite direction. The car appeared to be pulling over and stopping along the sidewalk in front of 29 Laurel Street. Officer Carmody could not recall if the officers were speaking in the car. (1:12). He did not recognize the Mountaineer (1:12, ln11-12). Officer Carmody claimed that their Taurus was traveling at

---

[1] The numbers refer to the day, page number and line numbers of the transcripts of the Motion To Suppress hearing. "1:" refers to day one, "2:" refers to day two, ":#" refers to the page number, and "ln #" refers to the line number.

1

about 10 miles per hour (1:12, ln 22-24).; Officer Lopez believed it was between 10 and 20 miles per hour (1:74, ln 7-8). Officer Carmody claimed that he looked into the front windshield of the Mountaineer and could see (1) Alexis Morales seated in the front passenger seat and (2) the face and upper chest area of Raul Aponte in the backseat on the passenger side. (1:57, ln 14). Officer Lopez stated that he did not notice any particular individual. (1:84, ln 14-19). At that point Officer Carmody testified that he stated "Raul's in that car. Spin around." (1:60, ln 20). Officer Lopez testified that Carmody stated that he saw Alexis and Raul Aponte in the car. (1:73, ln 16-24).

      The Taurus then turned around and parked behind the white Mountaineer. The officers began to get out of the Taurus and approached the Mountaineer. Officer Lopez approached from the passenger side. He recalled seeing movement from the front passenger seat to the rear seat. He described the motion as if the front seat passenger was "either getting something or, you know, secreting something somewhere. It was definitely movement from the person in the front towards the person in the back." (1:88, ln 11-15). Carmody described a similar motion. (1:61, ln17-19). Carmody claimed to have been able to see this movement through the "rear window." (1:61, ln 24). Lopez claimed that he could not see through the rear window because it was "tinted out," and that he could see the movement through the side of the vehicle. (1:88, ln 18-22). At no point did Carmody tell Lopez or the other officers where in the car Aponte was seated. (1:19, ln 6-9). This was so even though Carmody testified that there was a "execute without delay" warrant for Aponte's arrest. (1:60, ln3-4). When the officers reached the passenger side of the car, Lopez removed Morales form the car and pat frisked him. (1:20, ln 2). Officer Lopez testified that after finding no weapons on Morales, he ordered him to "go wait over there." (1:90, ln 23). Morales complied with the command and waited at the scene. (1:91, ln 4-5). Andrews

2

testified that Morales was physically brought to the sidewalk, that he was not handcuffed, but was made to sit down on the curb.[2] (1:127, ln 23). Lopez and Carmody then removed Aponte from the back seat of the vehicle, handcuffed him, and had him wait on the curb. (1:28, ln 10-13). Lopez claimed to have seen what he believed to be drugs in the pouch compartment behind the passenger seat. (1:76-77). Once Aponte was seated on the sidewalk, Lopez and Carmody removed the drugs from the car. (1:77, ln 9-14). Carmody then gave a special signal which had the officers remove Andrews from the driver seat, place him and Morales in handcuffs, and had them sit along the sidewalk.

Once seated on the sidewalk Morales and Andrews initially complained about being arrested. (2:24, ln 18-24). Once they realized that drugs were removed from the car, a discussion ensued among the three individuals as to whom would take responsibility for the drugs. Andrews was vocal in his insistence that he did nothing wrong and that he would not be held responsible for the drugs. (2:28, ln 2-5). Aponte was whispering in both English and Spanish to Morales. Aponte was heard pleading with Morales to take responsibility for the drugs. (2:28-29). Aponte was heard telling Morales that the drugs weighed only 7 grams (a "quake"). (2:33, ln 8-17). After more pleading and prodding, Morales eventually stated that the drugs were his. Both Officer Carmody and Lopez claim responsibility for not only hearing the statement, but for Morales to make a written statement.

The stop occurred at 7:20pm on June 7, 2005. (Exhibit 1). Carmody testified that from the time the car was stopped until the transport arrived was "probably 20 minutes" (1:54, ln 7). Morales was taken to the police station with Aponte. Andrews was released at the scene. The Worcester police station is less than one thousand feet from the entrance to Laurel Street. (1:82,

---

[2] Morales' affidavit likewise states that he was forced to sit on the curb upon being removed from the car.

3

ln 11-13). Once at the station, Morales signed his Miranda rights and answered the officers' questions.[3] Lopez testified that it took between 15 to 20 minutes from getting to the station until Morales signed the Miranda form. (1:83, ln 1-4). According to Miranda warning Card, Morales signed his Miranda warning as 8:45pm.

Between 4:25 and 4:30pm on January 18, 2005 the Court conducted a view of the Mountaineer which was parked on Main Street facing the Federal Courthouse in Worcester, MA. (1:114). During the view, Andrews sat in the driver's seat. (1:114). A private investigator, Robert Diaz, sat in the rear seat, behind the passenger seat. (1:114). The Court observed the car from the driver's side at an angle approximately 10 to 12 feet from the car. (1:114). The Court was unable to observe the face of the person sitting in the rear passenger seat. (1:114)

I. **THE GOVERNMENT HAS FAILED TO ESTABLISH REASONABLE SUSPICION FOR STOPPING THE DEFENDANT AND THE WHITE MOUNTAINEER**

At a motion to suppress, the Government bears the burden of demonstrating the legality of the stop. The Government has failed to meet its burden. The testimony of Carmody that he was able to see Aponte in the back seat is not sufficiently credible to justify the stop in this case. Carmody was the back seat passenger in a moving automobile, which was traveling down a "steep" incline. He was not specifically looking for Aponte, but rather was on general patrol, unable to remember if he was in conversation with the other officers in the car.

Furthermore, he was looking into a tinted front windshield, attempting to discern the identity of the person seated in the rear seat behind the passenger. While the view conducted on

---

[3] A copy of the Miranda form and statements are included in Exhibit 1.

4

January 18th was not identical to Carmody's view, it is certainly an adequate example of Carmody's opportunity to view a rear seated passenger. On both June 7, 2003 and January 18, 2004, the sun was not directly visible in the sky, the Mountaineer was parked with the sidewalk on the passenger side of the car, and there were buildings and obstructions on either side on the car on Main Street (buildings), and on Laurel Street (housing complex and trees; see exhibit 8). In conducting the view, the Court, while completely focused, standing still, and looking directly into the car was unable to discern the face of the person seated in the rear passenger seat. These circumstances are significantly better than those in the case of Carmody, who was in a moving vehicle, with less time and more potential distractions.  Even if the Court were to find that the conditions at the time of the offense were brighter because it was a summer evening, this would not assist Carmody's viewing abilities; the sun would either be in his eyes, or if the outside of the car is brighter than the inside of the car, he would have a higher degree of difficulty in being able to discern the particular person or feature seated within the darker area of the passenger area.

      Furthermore, Carmody's action in conducting the seizure are not internally consistent with his knowledge that Aponte was seated in the rear passenger seat. Carmody claimed that he saw Aponte, even though no other officer, including Officer Lopez saw Aponte. Carmody claimed to have been able to see movement from the heavily tinted rear window, even though Officer Lopez claimed he could not. Carmody claimed that he saw Aponte, who had an "execute without delay" warrant, and yet did not initially arrest him, but rather had Morales removed first. Carmody knew Aponte from prior arrests and knew that his warrant was for a violent offense (assault and battery) yet he did not inform the other officers where in the car Aponte was seated.

5

Carmody claims that Morales is a potentially dangerous individual, yet he leaves him to stand unguarded behind him while he removes Aponte.[4]

In addition, the officers' recollection of time frame of this event is not accurate. The overall time frame which the officers testified to: a quick arrest and search which took approximately 20 minutes, is not supported by the testimony or evidence. Given that the stop occurred at 7:20, if the officer's time frame is correct, then Morales would have been on the transport wagon by 7:50 and in the station being read his Miranda rights by 8:15pm. This is contradicted by the Miranda Warning card which was not read and signed until 8:45. Andrews' recollection regarding the time frame of the entire event taking 40 minutes (2:37, ln 9-14) is much more consistent with the time frame established by the Miranda Card. This indicates that his version of the events, namely a quick removal from the car followed by a long search period, is more likely to have occurred. This contradicts the officers' testimony that they stopped and approached the car merely to remove Aponte from the car. The Government has failed to support the officers' credibility in regards to seeing Aponte in the car prior to removing Morales from the car. This, in conjunction with the other inconsistencies with the testimony heard during oral argument, demonstrate that the Government has not established the officers' credibility sufficiently to justify the stop.

II. **THE DEFENDANT WAS "SEIZED" WHEN ORDERED TO REMAIN AT THE SCENE**

The Government's initial memorandum claimed that the Defendant should have felt free to leave because "he was not ordered to remain" at the scene. (Government's Memorandum pg. 11). This was likely based on Officer Carmody's sworn affidavit that Lopez told him to "stand

---

[4] Carmody claimed that Officer Vo was the cover officer watching him. Lopez could not testify as to where Office Vo was located or what his duties where.

6

over there." Contradicting Carmody was Officer Lopez' sworn testimony in Court that he told the Defendant to "go wait over there." The clear meaning of the term "wait" is that one is not free to leave, but must remain in the area until released. Merriam-Webster defines the term "wait" as "to remain stationary in readiness or expectation <*wait* for a train>". Furthermore, the order to "wait over there" was made by an armed police officer, who had just finished physically removing Morales from the car and frisking him. To suggest that being ordered to "wait" by an armed police officer allows even an innocent person to believe that he does not have to wait, but can leave, is illogical.

Furthermore, Andrews testified that the Defendant was placed on the curb once removed from the car. This testimony is particularly credible given that the officers both claimed that Morales was a potentially dangerous individual who could have potentially interfered with the arrest of Aponte. This is also supported by the Defendant's affidavit filed with the Court stating that he was placed on the sidewalk. Regardless of whether the Court credits Officer Lopez's testimony or Andrews,' a seizure occurs once the Defendant is ordered whether to "wait over there" or required to sit on the curb, as he is not free to leave the area. In addition, given that the Defendant lives in the area, and was seen numerous times by both officers in the area of Plumley Village, it is certainly reasonable to assume that he would have left the area, but for the officers' statements and actions. [5]

### III.   THE COURT HAS JURISDICTION TO REVIEW VIOLATIONS OF STATE CONSTITUTIONAL ISSUES IN UNIQUE SITUATIONS

---

[5] This is a distinguishing factor from those arrests where a car is stopped on a highway where a passenger has no option but to wait for the police to release the driver and the car.

This Court does have the authority to adjudicate any violation of a criminal defendant's state constitutional rights. *United States v. Pratt*, 913 F.2d 982, 986 (1st Cir. 1990). The First Circuit has stated that if state law enforcement officers, acting without federal involvement and in knowing violation of state law, gather evidence which is inadmissible in state court but admissible in federal court, the federal court should not condone the use of such evidence because to do so would permit federal officials to "allow illegally seized evidence to be handed them on a 'silver platter.' *Pratt*, 913 F.2d at 986 (quoting *United States v. Ajudi*, 835 F.2d 943, 946 (1st Cir. 1987); *See also United States v. Jarabek*, 726 F.2d 889, 900 (1st Cir. 1984). The First Circuit has tempered this exception by further requiring that there be a "flagrant abuse of the law by state officials" *United States v. Sutherland*, 929 F.2d 765, 770 (1st Cir. 1991).

Whether the facts of this particular case demonstrate a flagrant abuse of law by state officials depends on the amount of credibility given to Officer Carmody and Lopez. Should the Court credit the testimony of Andrews in all major respects, then the Court could find that the stopping and removing of Morales from the car without any reasonable suspicion clearly violates Morales' rights under the Massachusetts state constitution. The officers were not in any way working with or for federal law enforcement officers. Therefore, should the Court find a "flagrant abuse" by these particular officers, it could very well adjudicate Morales' state constitutional right claims.

## Conclusion

For the foregoing reasons, the Court should find that the Government has failed to establish that the officers' actions were supported by reasonable suspicion or probable cause to believe that Aponte was in the car. Furthermore, the Court should find that the detention of Morales after being removed from the car was in violation of his State and Federal Constitutional rights.

As such this Court should allow the Defendant's motion and suppress the drugs allegedly located in the vehicle and the statements made both at the scene and at the station.

                              Respectfully Submitted,
                              ALEXIS MORALES
                              By His Attorney


                              _____/"Eduardo Masferrer"/_____
                              Eduardo Masferrer
                              BBO # 644623
                              Masferrer & Hurowitz, P.C.
                              6 Beacon Street Suite 720
                              Boston. MA, 02108