UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
)
v. ) CRIMINAL NO. 04-40019-FDS
)
ALEXIS MORALES )
)
Defendant. )

### GOVERNMENT'S MEMORANDUM FOLLOWING AN EVIDENTIARY HEARING TO DETERMINE DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

The United States of America files this memorandum, following an evidentiary hearing to determine Defendant Morales' motion to suppress evidence. The evidentiary hearing established that Defendant was never seized and that the original stop of the SUV was lawful action to arrest Aponte. For these reasons and the reasons set forth below, the motion should be denied.

## I.  Morales Was Not Seized When Told to Wait/Stand Nearby

Defendant argues that he was seized after being removed from the SUV and patted-down. He further argues that had he not been seized, he would not have been present when the drugs were recovered and hence would not have confessed to ownership of the drugs. There are two errors in this argument. The first is its very premise: Defendant was never seized.

"Under the Fourth Amendment, a seizure occurs when a police officer by means of physical force or a show of authority, has in some way restrained the liberty of a citizen." United States v. Sealy, 30 F.3d 7, 9 (1st Cir. 1994) citing Terry v. Ohio, 392

1

U.S. 1, 19 n.16 (1988).  The <u>Sealy</u> Court explained:

> In <u>United States v. Mendenhall</u>, 446 U.S. 544, 554 (1980), a plurality first announced a test to determine if an individual's liberty had been restrained: "a person had been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." . . . The Supreme Court later explained that a person's reasonable belief that he was not free to leave was "a *necessary*, but not *sufficient* condition for seizure." <u>California v. Hodari D.</u>, 499 U.S. 621, 628 (1991)(emphasis in original).

<u>Sealy</u>, 30 F.3d at 9.  The reasonable person test is objective and "presupposes an *innocent* person." <u>United States v. Drayton</u>, 536 U.S. 194, 202-03 (2002) *quoting* <u>Florida v. Bostick</u>, 501 U.S. 429, 437-38 (1991)(emphasis original).  Moreover, the fact that a person is not told that he is free to refuse to cooperate, does not render the encounter a seizure.  <u>Drayton</u>, 536 U.S. at 203.

Applying this standard, no seizure of Defendant occurred on June 7, 2004 until after the discovery of the crack cocaine gave police probable cause to do so.  The credible testimony showed that after Lopez removed Defendant from the SUV and conducted a pat-down (which did not result in the seizure of any contraband), he instructed Defendant to "stand over there," [Hg. 1:22-23; 1:58] or to "wait over there." [Hg. 1:75; 1:90-91].[1]  Defendant was not: handcuffed, told he was under arrest, given Miranda

---

[1]"Hg." denotes transcript references.  "1:" precedes references to the first day of testimony; "2:" to the second.

warnings, or physically restrained. No weapon was drawn. Indeed, as Defendant knew, the pat-down yielded no contraband or evidence which would have led a reasonable person to believe that he was not free to leave. [Ex 1; Hg. 1:58; 1:75-76]. Defendant was not restrained in any way, and stood a number of feet away as Carmody and Lopez removed Aponte. [Hg. 1:25; 1:28].

Plainly, if the police intended to seize Defendant, they would have. They had the means to restrain Defendant. If it was their intention to do so when Lopez directed Defendant to "wait" or "stand" over there, the police could have dealt with Defendant as they did Aponte when they removed Aponte from the SUV: cuffing him and seating him on a curb. [Hg. 1:27-28].

Rather, there were absolutely no restraints placed on Defendant. In fact, after the pat-down, Defendant was no differently treated than Andrews' mother, a bystander. She, like Defendant, was watched by Officer Vo, who was the "cover" officer - the officer assigned to keeping the public away while police effected an arrest or conducted other police business. [Hg. 1:23-24]. She like Defendant stood 7-8 feet away. [Hg. 1:25; 1:46]. Certainly, there is no argument that Vo's actions indicated that Andrews' mother was not free to leave.

Although Defendant elicited from Carmody that if Defendant had fled, Carmody would have chased him [Hg. 1:22], the subjective intention of Carmody is irrelevant, unless such

3

intention had been conveyed to Morales.  See <u>United States v.</u>
<u>Mendenhall</u>, 446 U.S. 544, 554 n.6 (1980)(plurality)(subjective
intention of DEA agent to detain defendant irrelevant to whether
defendant seized, unless conveyed to him).[2]  Moreover, the self-
serving statement in Defendant's affidavit that he did not feel
that he was free to leave, while a requirement for there to be a
seizure, is not controlling.  See <u>Hodari D.</u>, 499 U.S. at 621.

Next, Andrews' testimony that he saw Defendant seated behind
the SUV after Defendant was removed is simply not credible.
First, it was not possible to see the curb behind the SUV from
the rear view mirror, as Andrews first testified. [Hg. 1:129].
Second, it was squarely at odds with the testimony of Officers
Carmody and Lopez, and the testimony of the police makes more
sense.  For instance, Lopez testified that when he discovered the
crack cocaine, he did not blurt out his discovery for fear that
Defendant and Andrews might run. [Hg. 94].  Such a concern would
not have occurred to Lopez if Defendant were detained, as Andrews
suggested.

Finally, if the Court credits the testimony of Carmody that
police pulled over the SUV in order to arrest Aponte, it follows
that the police would have permitted Defendant, once it was

---

[2]Moreover, if Defendant had run, pursuit of him would not
even amount to a seizure unless and until Defendant was caught –
which was unlikely since Carmody was struggling with Aponte – or
submitted to a show of force.  <u>Hodari D.</u>, 499 U.S. at 626.

4

determined he was unarmed, unfettered liberty. As Lopez noted: "[Aponte] was our concern . . . [w]hen we got Lex out of the way, we quickly went right to the back [of the SUV]." [Hg. 1:91; 1:95]. A reasonable person, innocent of a crime, would not have believed under the circumstances that he was not free to leave.

## II.  Even If Defendant Was Unlawfully Detained, Intervening Events Attenuated Any Taint.

Even if the police unlawfully detained Defendant – and for the reasons stated above, they did not – Defendant's statements at the scene and later at the police station were acts of Defendant's free will and the product of significant intervening events. Thus, they are attenuated from any taint and admissible. This is the second error in Defendant's motion to suppress.

### A.  Attenuation

It is established that even if an arrest were illegal, a subsequent statement is admissible if it was voluntary and lacked any causal connection to the illegal detention. See Brown v. Illinois, 422 U.S. 590, 604-04 (1975); Wong Sun v. United States, 371 U.S. 471, 488 (1963). In Wong Sun, the Court said:

> We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'

Id. at 487-88 citing Maguire, Evidence of Guilt, 417 (1925).

5

In <u>Brown</u>, the Court identified factors for courts to consider in determining whether the causal chain has been sufficiently attenuated: the time elapsed between the illegality and the acquisition of the evidence; the presence of intervening circumstances; and the purpose and flagrancy of the official misconduct.[3]   <u>Brown</u>, 422 U.S. at 603-04.   <u>Brown</u> further noted that no single fact is dispositive, that the voluntariness of the statement is a threshold requirement, and that <u>Miranda</u> warnings alone are not sufficient to dissipate the taint of an illegal detention from a subsequent statement.   <u>Id</u>. at 602-04.

Applying the legal framework set out in <u>Wong Sun</u> and <u>Brown</u> to the facts of this case, it is clear that each of Defendant's statements was an act of Defendant's free will and not the product of an illegal detention.   We take the statements in chronological order.

## B.   The curbside statement was sufficiently attenuated.

Defendant's statements at the scene, that the crack cocaine was his (hereafter, the "Curbside Statement"), clearly followed the alleged illegal detention.   However, it was sufficiently

---

[3]<u>Brown</u> involved the arrest without probable cause and without a warrant of a murder suspect.   The police broke into Brown's apartment and waited for him with guns drawn.   When Brown approached his front door, detectives inside the apartment and out trained their guns on Brown and told him not to move, that he was under arrest.   Thereafter, Brown was given <u>Miranda</u> warnings first by detectives and later by a prosecutor.   Following each warning, Brown made statements.

6

attenuated from that detention to remove any taint.

As a threshold matter, the Curbside Statement was voluntary. As we showed in our original submission, the Curbside Statement was not the product of police interrogation or its equivalent, or even of any state action.  Rather, as the suppression hearing showed, a conversation between Defendant and Andrews produced the statement.  Andrews said that someone better own up to this [Hg. 2:28]; that he was not going to take this [Hg. 1:47-48]; that it was not his stuff [Hg. 1:78].  In response, Defendant said, "That shit is mine," [Hg. 1:49-50]; "That's my stuff.  They had nothing to do with it.  It's all mine." [Hg. 1:78; 1:96-98].  Indeed, if the Court credits Andrews (and for the reasons stated below, it should not), up to the point of the Curbside Statement, the extent of the participation to the police was to discourage anyone from speaking and to enforce this order by hitting Aponte. [Hg. 1:130; 2:26-27; 2:32; 2:44].  Only after the Curbside Statement did the police ask Defendant to repeat the statement and explain that Defendant would have to sign a written statement in order for the police to credit the Curbside Statement. [Hg. 1:51-52].  These facts show the Curbside statement was voluntary.

Even though little time passed between the detention and the statement, the detention did not establish a causal link.  In fact, the time between telling Defendant to stand or wait nearby, and the recovery of the crack cocaine is so short that in all

7

likelihood, had Defendant walked away, the police would have easily located him, lawfully returning him to the site of the alleged illegal detention.

The remaining <u>Brown</u> factors also support finding the causal link was sufficiently attenuated. There was a significant intervening circumstance: the conversation between Defendant and Andrews. In fact, there is no other plausible explanation for the Curbside Statement confession other than Andrews' protestations that he was not going to take the fall for someone else's drugs.

Finally, there was neither purpose nor flagrancy in the police conduct. Lopez simply directed Defendant to stand or wait a distance away. Even if this justified Defendant in believing he was not free to leave – and it did not – it certainly was not purposeful conduct designed to obtain a confession or other evidence. And there was nothing flagrant about the instruction. It was not accompanied by an order to lie on the ground spread-eagle. It did not subject Defendant to humiliation. It did not involve a violation of some well-settled procedure or rule such as an unlawful entry into a suspect's residence. <u>Cf</u>. <u>Brown</u>. Rather, it was a reasonable order under all the circumstances, intended to separate Defendant from the SUV so that Aponte could be arrested. For all these reasons the Curbside Statement was sufficiently attenuated from any illegal conduct.

8

## C.  **The Written Statement Was Sufficiently Attenuated.**

The written confession is even more attenuated from the taint of an illegal detention, and the evidence shows that it too is the product of Defendant's free will.

The written statement was voluntary – a matter that is not seriously disputed.  Defendant was given <u>Miranda</u> warnings, and signed a card that not only contained these warnings, but also memorialized Defendant's understanding of these rights and his desire to speak with the police, having been advised of his rights.  <u>See</u> Exhibit 1.  With the rights card is a typed-written statement of questions put to Defendant and his responses. Defendant placed his initials next to each response and signed the written statement. <u>Id</u>.  Moreover, the atmosphere was calm and relaxed. [Hg. 1:102].  Defendant was cooperative and jovial.  He sang a rap song and talked about his mother.  [Hg. 1:81].

Apart from the overwhelming evidence that the written statement was voluntary, the <u>Brown</u> factors show an even greater degree of attenuation from the alleged detention than the Curbside Statement.  First, the confession was given at 8:40 p.m., more than an hour after the recovery of the crack cocaine. [Hg. 1:54 (Morales cuffed 5-7 minutes after stop)].  Second, it was given after a change in both the location and identity of the person interacting with Defendant.  At the time of the written statement, Defendant was in the lieutenant's office at the Police

9

Station. [Hg. 1:102]. The written statement was the product of his conversation with Lopez. Id. Andrews had been released [Hg. 1:53; 1:104], and Aponte was transported in an arrest wagon [Hg. 2:36]. Hence, neither was present.

Finally, rather than being the product of flagrant misconduct, as noted above, the alleged illegal detention was a reasonable measure under all the circumstances, taken by the police to insure they could effect Aponte's arrest without interference. At the same time, there is no allegation of misconduct involving the written statement. Defendant was lawfully arrested based on probable cause (whether or not he had given the Curbside Statement). The written statement was the product of circumstances involving full regard for Defendant's fifth amendment rights and compliance with the prophylactic measures of Miranda. The facts establish that the confession was voluntary and sufficiently removed from any taint of the alleged illegal detention.

## III. Carmody's Testimony Showing the Stop Was Lawful Is Credible and Fully Corroborated

At the evidentiary hearing, the government's case included the testimony of police officer James Carmody. In summary, Carmody testified that on June 7, 2004, at approximately 7:20 p.m., he was seated behind the driver in an unmarked police car. As the car traveled down an incline, Carmody noticed through the windshield of a slowly-approaching white SUV that Raul Aponte,

10

for whom there was a warrant to be executed without delay
(hereinafter "EWOD"), occupied the back seat, and that Defendant
occupied the front passenger seat.[4]   Carmody reported his
observations to the three other officers in the car and told the
driver to turn around.   When the police did so, the SUV was idle
at the curb. [Hg. 1:12-15; 1:60-61].

If the Court finds that Carmody is credible – and it should
– then there is no question that (1) the police lawfully stopped
the SUV; and (2) the viewing, orchestrated by Defendant without
notice, and flawed by gross differences in lighting conditions,
is irrelevant.   Indeed, Defendant has conceded that, if accepted,
Carmody's observation gave police probable cause to stop the SUV.

## A.   Carmody's testimony is credible.

Carmody was a credible witness, and the Court should so
find.   As a preliminary matter, there was no evidence that
Carmody has ever failed in his duty to tell the truth.   Rather,
Carmody is a ten-year veteran of the Worcester Police Department,
Ex.1, ¶1, with a long career ahead of him.   It is implausible
that Carmody would jeopardize his integrity and his career by
lying.   And it is the more so where, as here, he would be doing
so merely to protect from suppression evidence obtained from a
person whom Carmody has participated in arresting on a number of
occasions – Defendant for drugs and a weapon.   [Hg. 1:63].

----

[4]By the time of the hearing, the SUV had been painted black.

There was also no evidence that Carmody harbored a bias against Defendant that would cause him to abandon the obligations of his oath.  Indeed, the extent to which Carmody's testimony inculpates Defendant - that there was crack cocaine in the car and that Defendant confessed (twice) to being the owner of the crack cocaine - is not in dispute.

Third, Carmody is fully corroborated.  Carmody testified that Defendant was the front passenger; he was.  Carmody testified that Aponte was the lone rear passenger; he was. Carmody testified that Aponte was wanted on an EWOD warrant; he was.  Carmody testified Aponte and Defendant were in a white SUV; they were (notwithstanding that fact that it is now black). Carmody testified that the SUV was moving slowly; it was.  In fact, in the brief time the police needed to turn around, the SUV came to a complete stop. [Hg. 1:12-14; 1:60-61].  Carmody's observations are proved by a statement he made in the patrol car. Lopez testified that Carmody reported who was in the white SUV and instructed the driver to turn around, [Hg. 1:73; 1:84-85], which Carmody could not have done had he not seen Aponte and Defendant.  Carmody testified that he could see through the SUV's windshield, which is what Andrews said: from the driver's seat, Andrews made eye contact with Carmody and said, "Look at the cops." [Hg. 1:124-25].  Every critical observation Carmody testified he made, and the means by which he made each, is

12

independently proved, showing Carmody's fidelity to the oath to
tell the truth.

Next, Carmody's testimony makes sense in light of the
independent and uncontroverted facts. There is no question that
police stopped the SUV; there is no question that inside that SUV
was Aponte; and there is no question that there was an arrest
warrant for Aponte. The most logical explanation for the actions
of the police is, as Carmody testified, that he saw Aponte in the
SUV, was aware of the warrant and instructed the driver of the
unmarked car to stop the SUV.

Alternative explanations are problematic. For instance, if
Carmody is not telling the truth, then neither is Lopez. That
would mean that not one veteran police officer, but two,
fabricated a story, trading their integrity and possibly their
careers for this case. That seems incredible and, as noted, even
more so, given that arresting Defendant on drug charges was not
an isolated or unique event. Similarly, if Carmody were not
telling the truth, then the police are enormously fortunate that
the SUV they randomly stopped happened to be occupied by someone
for whom there was an arrest warrant. Finally, if Defendant's
presence in the SUV was the basis for the stop, then Carmody
could see into the SUV in order to make that observation.

It simply makes sense that the police stopped the SUV
because, as Carmody testified, he saw Aponte inside and was aware

13

of the warrant for his arrest.  The Court should find Carmody credible.

## B. **The viewing was grossly different from the real stop.**

Notwithstanding the foregoing reasons to fully credit Carmody, his veracity has been placed in issue by nothing more than the viewing of the SUV and, to some extent, the testimony of Defendant's close friend, Andrews.  (Defendant never produced the witnesses that his papers said would testify to how the speeds of the cars disprove Carmody's observation).  Taking these matters in order, if the viewing even remotely reproduced the conditions on which Carmody's averments were based, the challenge might deserve some consideration.  But, the difference in the conditions in June 2004 and January 2005 were as extreme as the difference in the color of the SUV itself: white and black; and rather than being merely ancillary, these differences go to the very core of Carmody's opportunity to observe.

For instance, rather than conducting the viewing near the "longest" day of the year when the sun rays are most direct, the viewing was conducted near the "shortest" day of the year, when the sun rays are weakest, and the hours of sunlight are fewest. Second, at the viewing, light into the passenger side (on which both Defendant and Aponte had been seated in June) was blocked; a shadow from a row of multi-story buildings not more than 10 feet from the passenger side obscured the SUV.  Third, Defendant

14

ignored the vantage point from which Carmody saw Defendant and Aponte: higher up and looking down into the SUV. [Hg. 1:57]. Finally, the viewing ignored the fact that the police car and SUV were approaching each other from opposite directions. [Hg. 1:60]. Changes in position of the SUV *vis-a-vis* the sun and buildings may have brought the occupants of the SUV in (and out of) view. In sum, the viewing so patently failed to reproduce the conditions under which Carmody saw Aponte, it cannot be a serious reason to question the veracity of Carmody (and Lopez).[5]

## C.  **Andrews' testimony should be rejected.**

The only other evidence from which Defendant might argue that Carmody is not credible, is testimony from Andrews, and there are a number of reasons this argument and its basis are without merit.  The evidence shows that Andrews is biased in

---

[5]The Court invited the government to suggest an appropriate remedy for the flawed viewing.  In our estimate, the only way to conduct a viewing is to do so at or around June 7, because lighting conditions, the position of the sun, weather, respective positions are so critical.  We believe the SUV should be white, as it was, and not black, because this change may also affect the ability to see in.  Thus, we move that the viewing be striken. We do not believe that this proposal is unfair or unreasonable. The evidence showed that approximately a month after the stop, photographs were taken of Laurel Street, Defendant dismantled the interior of his car (and had to pay to have it put together again) in anticipation of litigating the stop. [Hg. 2:7-14; 2:49].  Defendant should have moved for a viewing at that time. To inform the Court of the dramatic differences between June 7, 2004 and the viewing, we ask the Court to take judicial notice of the information in Exhibits 10 and 11 hereto, the U.S. Naval Observatory Sun and Moon Data for June 7, 2004 (Ex. 11), and the data from channel WCVB in Boston for June 7, 2004 (Ex. 12).

Defendant's favor.  They grew up together [Hg. 1:121]; Andrews
gave up at least two days of income to testify at this hearing,
traveled from Providence, and took time to prepare for this
hearing - meeting with counsel for Defendant and even dismantling
parts of the interior of the SUV to - according to Andrews - re-
create the condition in which police left the SUV [Hg. 2:2-7;
2:51].  Moreover, Andrews must necessarily feel a debt to
Defendant for the Defendant's confession to ownership of the
drugs - a fact not in dispute - since it spared Andrews arrest
and the possible seizure of his recently-purchased SUV.

     The affect of this bias was that Andrews gave testimony that
was simply not credible and that was calculated to help
Defendant's motion.  For instance, Andrews sought to tarnish the
conduct of the police at every opportunity: at the stop they were
yelling [Hg. 1:125]; during the search they pulled apart and
damaged the interior of his car [Hg. 1:131].  These allegation
are not credible.  The police had no incentive to approach the
car in a confrontational way because of concerns for police
safety and the possibility that Aponte might flee.  Similarly, as
to the condition of the car, it would be unusual if the panels
behind the back seat of an SUV did not have some damage already,
given that the SUV was 7 years old, had over 100,000 miles and,
as Exhibit 6 shows and Lopez testified, there were a lot of
things in the back of the SUV, and moving them could have as

                              16

easily caused the damage Andrews attributes to the police.  In addition, to state that the police ripped all the paneling out is an overstatement, given that the only panel in a photograph, Exhibit 4, can be opened with tabs or latches.

In other ways too, Andrews' testimony did not make sense or was internally inconsistent.  Andrews testified on one hand that when the police approached he was too scared to look anywhere but straight ahead. [Hg. 1:125-26].  On the other, he testified that he routinely was stopped by the police. [Hg. 1:129].  He saw through the rear view mirror Defendant sitting, not laying, on the curb, [Hg. 1:129]; but the lower half of the rear windshield of the SUV is a solid door through which Andrews could not see, [2:42].  Andrews later qualified this inconsistency by testifying (for the first time on redirect), that he heard the police tell Defendant to sit down. [Hg. 2:63].[6]

Andrews testified that in the six months leading up to June 7, 2004, he was never alone with the Defendant [Hg. 1:121; 2:38]; it is simply incredible that Andrews should remember such a fact, and there is no reason that Andrews should.  Andrews testified

---

[6]What suggests that hearing police tell Defendant to sit down is fabrication is that this would be an important fact to a determination of whether Defendant was seized, a key issue.  It is reasonable to infer that Defendant's counsel carefully probed Andrews for any evidence to support the claim of a seizure and if the order to sit had been really issued, Andrews would have said so during preparation for the hearing, and Defendant would have elicited that fact on Andrews' direct.

that the police asked if anyone had warrants and Aponte said that
he did. [Hg. 1:130]. It is implausible that Aponte would have
admitted to the warrant, since at that time there was no basis
for Aponte to believe that he was going to be arrested. In other
words, for all Aponte knew, the stop had nothing to do with him.
Presumably, if Aponte knew about the warrant and was unwilling to
self-surrender, he was as unwilling to admit he had a warrant.

Incredibly, Andrews recalled, without the least hesitation
and in contrast to Lopez and Carmody, the exact order in which
he, Aponte and Defendant were seated [Hg. 1:130], despite the
fact that he is routinely stopped by the police. This testimony
was plainly elicited to lay the foundation for Defendant's claim
that he was duped into confessing. Andrews testified that the
Asian police officer hit Aponte and the police told Aponte,
Defendant and Andrews to shut-up, [Hg. 2:26-27; 2:32; 2:44]; yet
Andrews conceded a crowd, including his own mother, gathered,
[Hg. 2:45]. The presence of witnesses made this conduct and
testimony all the less likely.

In sum, Andrews had a bias toward Defendant and it affected
his testimony. Whatever significant differences exist between
his testimony and the testimony of Carmody are not indications
that Carmody was anything less than truthful, but that Andrews
was prepared to color his testimony to help his childhood pal.

On this record, the Court should reject Defendant's attack

18

on the integrity of the officers and find their testimony credible and that the stop was lawfully conducted.

## CONCLUSION

The motion to suppress should be denied.

Respectfully submitted,

Michael J. Sullivan
United States Attorney

By: _David Hennessy_
David Hennessy
Assistant U.S. Attorney


## CERTIFICATE OF SERVICE

This is to certify that I have this day served upon the person listed below a copy of the foregoing document by depositing in the United States mail a copy of same in an envelope bearing sufficient postage for delivery:

Eduardo Masferrer
Masferrer & Hurowitz, P.C.
6 Beacon Street
Suite 720
Boston, MA 02108

This 26th day of January, 2005.

_David Hennessy_
David Hennessy
Assistant U.S. Attorney

Page 1 of 1

**U.S. Naval Observatory**
**Astronomical Applications Department**

## Sun and Moon Data for One Day

The following information is provided for Worcester, Worcester County, Massachusetts (longitude W71.8, latitude N42.3):

```
     Monday
     7 June 2004              Eastern Daylight Time

              SUN
     Begin civil twilight      4:37 a.m.
     Sunrise                   5:11 a.m.
     Sun transit              12:46 p.m.
     Sunset                    8:22 p.m.
     End civil twilight        8:56 p.m.

              MOON
     Moonset
     Moonrise                  8:35 a.m. on preceding day
     Moon transit             12:18 a.m.
     Moonset                   5:02 a.m.
     Moonrise                  9:54 a.m.
                              12:50 a.m. on following day
```

Phase of the Moon on 7 June:   waning gibbous with 73% of the Moon's visible disk illuminated.

Last quarter Moon on 9 June 2004 at 4:03 p.m. Eastern Daylight Time.

————————————————

Census Bureau map of Worcester area





# wunderground.com

## History for Worcester, Massachusetts
### on Monday, June 7, 2004

# June 7, 2004

### Daily Summary

| | Actual | Average | Record |
|---|---|---|---|
| **Temperature** | | | |
| Mean Temperature | - | **63** °F / **17** °C | |
| Max Temperature | **76** °F / **24** °C | **73** °F / **22** °C | **94** °F / **34** °C (1925) |
| Min Temperature | **48** °F / **8** °C | **53** °F / **11** °C | **40** °F / **4** °C (1958) |
| **Degree Days** | | | |
| Heating Degree Days | **3** | **4** | |
| Month to date heating degree days | 52 | 29 | |
| Since 1 July heating degree days | 6609 | 6786 | |
| Cooling Degree Days | **0** | **1** | |
| Month to date cooling degree days | 0 | 7 | |
| Year to date cooling degree days | 24 | | |
| Growing Degree Days | **12** (Base - ) | | |
| **Moisture** | | | |
| Dew Point | **49** °F / **9** °C | | |
| Average Humidity | **77** | | |
| Maximum Humidity | **100** | | |
| Minimum Humidity | **54** | | |
| **Precipitation** | | | |
| Precipitation | **0.00** in / **0.00** cm | **0.14** in / **0.36** cm | **1.10** in / **2.79** cm (1913) |
| Month to date precipitation | 0.55 | 0.98 | |
| Year to date precipitation | 16.62 | 20.65 | |
| **Snow** | | | |
| Snow | **0.00** in / **0.00** cm | **0.00** in / **0.00** cm | **0.00** in / **0.00** cm (2001) |
| Month to date snowfall | 0.0 | 0.0 | |
| Since 1 July snowfall | 49.4 | 63.1 | |
| Snow Depth | **0.00** in / **0.00** cm | | |
| **Wind** | | | |
| Wind Speed | **8** mph / **13** km/h () | | |
| Max Wind Speed | **14** mph / **23** km/h | | |
| Max Gust Speed | **17** mph / **27** km/h | | |
| **Visibility** | **8** miles / **13** kilometers | | |
| **Events** | | | |



GOVERNMENT
EXHIBIT
12
04-40019-E05


**wunderground.com**

**Daily Summary**
cord

Mean Temperature

### Daily Summary

|  | Actual | Average | Record |
|---|---|---|---|
| **Temperature** | | | |
| Mean Temperature | - | 63 °F / 17 °C | |
| Max Temperature | 76 °F / 24 °C | 73 °F / 22 °C | 94 °F / 34 °C (1925) |
| Min Temperature | 48 °F / 8 °C | 53 °F / 11 °C | 40 °F / 4 °C (1958) |
| **Degree Days** | | | |
| Heating Degree Days | 3 | 4 | |
| Month to date heating degree days | 52 | 29 | |
| Since 1 July heating degree days | 6609 | 6786 | |
| Cooling Degree Days | 0 | 1 | |
| Month to date cooling degree days | 0 | 7 | |
| Year to date cooling degree days | 24 | | |
| Growing Degree Days | 12 (Base - ) | | |
| **Moisture** | | | |
| Dew Point | 49 °F / 9 °C | | |
| Average Humidity | 77 | | |
| Maximum Humidity | 100 | | |
| Minimum Humidity | 54 | | |
| **Precipitation** | | | |
| Precipitation | 0.00 in / 0.00 cm | 0.14 in / 0.36 cm | 1.10 in / 2.79 cm (1913) |
| Month to date precipitation | 0.55 | 0.98 | |
| Year to date precipitation | 16.62 | 20.65 | |
| **Snow** | | | |
| Snow | 0.00 in / 0.00 cm | 0.00 in / 0.00 cm | 0.00 in / 0.00 cm (2001) |
| Month to date snowfall | 0.0 | 0.0 | |
| Since 1 July snowfall | 49.4 | 63.1 | |
| Snow Depth | 0.00 in / 0.00 cm | | |
| **Wind** | | | |
| Wind Speed | 8 mph / 13 km/h () | | |
| Max Wind Speed | 14 mph / 23 km/h | | |
| Max Gust Speed | 17 mph / 27 km/h | | |
| **Visibility** | 8 miles / 13 kilometers | | |
| **Events** | | | |

$5 \times 12$
2 of 5

**Key:** T is trace of precipitation, MM is missing value
**Source:** NWS Daily Summary



Show full METARS (help) - Comma Delimited File

| Time (EDT) | Temperature | Dew Point | Humidity | Pressure | Visibility | Wind Direction | Wind Speed | Gust Speed | Precipitation | Events | Conditions |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 12:30 AM | 48.2 °F / 9.0 °C | 48.2 °F / 9.0 °C | 100% | 30.09 in / 1018.8 hPa | 2.0 miles / 3.2 kilometers | North | 8.1 mph / 13.0 km/h | - | N/A | | Mist |
| 12:54 AM | 48.0 °F / 8.9 °C | 48.0 °F / 8.9 °C | 100% | 30.10 in / 1019.1 hPa | 2.0 miles / 3.2 kilometers | NNE | 8.1 mph / 13.0 km/h | - | N/A | | Mist |
| 1:54 AM | 48.0 °F / 8.9 °C | 48.0 °F / 8.9 °C | 100% | 30.09 in / 1018.9 hPa | 3.0 miles / 4.8 kilometers | North | 10.4 mph / 16.7 km/h | - | N/A | | Mist |
| 2:07 AM | 48.2 °F / 9.0 °C | 48.2 °F / 9.0 °C | 100% | 30.08 in / 1018.5 hPa | 3.0 miles / 4.8 kilometers | North | 10.4 mph / 16.7 km/h | - | N/A | | Mist |
| 2:54 AM | 48.9 °F / 9.4 °C | 48.0 °F / 8.9 °C | 97% | 30.10 in / 1019.1 hPa | 10.0 miles / 16.1 kilometers | North | 8.1 mph / 13.0 km/h | - | N/A | | Overcast |
| 3:54 AM | 48.0 °F / 8.9 °C | 48.0 °F / 8.9 °C | 100% | 30.09 in / 1019.0 hPa | 7.0 miles / 11.3 kilometers | North | 8.1 mph / 13.0 km/h | - | N/A | | Overcast |
| 4:23 AM | 48.2 °F / 9.0 °C | 48.2 °F / 9.0 °C | 100% | 30.09 in / 1018.8 hPa | 4.0 miles / 6.4 kilometers | North | 8.1 mph / 13.0 km/h | - | N/A | | Mist |

1/21/2005

| Time | Temp | Dew Point | Humidity | Pressure | Visibility | Wind Dir | Wind Speed | Gust | Precip | Conditions |
|------|------|-----------|----------|----------|------------|----------|------------|------|--------|------------|
| 4:54 AM | 48.9 °F / 9.4 °C | 48.0 °F / 8.9 °C | 97% | 30.12 in / 1019.8 hPa | 6.0 miles / 9.7 kilometers | North | 4.6 mph / 7.4 km/h | - | N/A | Mist |
| 5:54 AM | 48.9 °F / 9.4 °C | 48.0 °F / 8.9 °C | 97% | 30.13 in / 1020.2 hPa | 10.0 miles / 16.1 kilometers | NNW | 4.6 mph / 7.4 km/h | - | N/A | Overcast |
| 6:54 AM | 50.0 °F / 10.0 °C | 48.0 °F / 8.9 °C | 93% | 30.15 in / 1020.8 hPa | 10.0 miles / 16.1 kilometers | NW | 8.1 mph / 13.0 km/h | - | N/A | Overcast |
| 7:54 AM | 52.0 °F / 11.1 °C | 48.0 °F / 8.9 °C | 86% | 30.15 in / 1020.8 hPa | 10.0 miles / 16.1 kilometers | North | 4.6 mph / 7.4 km/h | - | N/A | Overcast |
| 8:05 AM | 53.6 °F / 12.0 °C | 48.2 °F / 9.0 °C | 82% | 30.14 in / 1020.5 hPa | 10.0 miles / 16.1 kilometers | North | 4.6 mph / 7.4 km/h | - | N/A | Overcast |
| 8:54 AM | 57.0 °F / 13.9 °C | 50.0 °F / 10.0 °C | 77% | 30.15 in / 1021.0 hPa | 10.0 miles / 16.1 kilometers | Variable | 3.5 mph / 5.6 km/h | - | N/A | Overcast |
| 9:54 AM | 61.0 °F / 16.1 °C | 51.1 °F / 10.6 °C | 70% | 30.14 in / 1020.6 hPa | 10.0 miles / 16.1 kilometers | NNW | 6.9 mph / 11.1 km/h | - | N/A | Partly Cloudy |
| 10:54 AM | 63.0 °F / 17.2 °C | 53.1 °F / 11.7 °C | 70% | 30.14 in / 1020.4 hPa | 10.0 miles / 16.1 kilometers | WNW | 8.1 mph / 13.0 km/h | - | N/A | Clear |
| 11:54 AM | 66.9 °F / 19.4 °C | 53.1 °F / 11.7 °C | 61% | 30.13 in / 1020.2 hPa | 10.0 miles / 16.1 kilometers | West | 12.7 mph / 20.4 km/h | - | N/A | Clear |
| 12:54 PM | 68.0 °F / 20.0 °C | 55.0 °F / 12.8 °C | 63% | 30.13 in / 1020.2 hPa | 10.0 miles / 16.1 kilometers | WSW | 8.1 mph / 13.0 km/h | - | N/A | Clear |
| 1:54 PM | 72.0 °F / 22.2 °C | 55.9 °F / 13.3 °C | 57% | 30.12 in / 1019.7 hPa | 10.0 miles / 16.1 kilometers | West | 8.1 mph / 13.0 km/h | - | N/A | Clear |
| 2:54 PM | 73.0 °F / 22.8 °C | 57.0 °F / 13.9 °C | 57% | 30.10 in / 1019.3 hPa | 10.0 miles / 16.1 kilometers | WSW | 6.9 mph / 11.1 km/h | - | N/A | Partly Cloudy |
| 3:54 PM | 75.0 °F / 23.9 °C | 57.0 °F / 13.9 °C | 53% | 30.10 in / 1019.1 hPa | 10.0 miles / 16.1 kilometers | West | 9.2 mph / 14.8 km/h | - | N/A | Clear |
| 4:54 PM | 75.9 °F / 24.4 °C | 59.0 °F / 15.0 °C | 56% | 30.09 in / 1018.9 hPa | 10.0 miles / 16.1 kilometers | SW | 6.9 mph / 11.1 km/h | - | N/A | Clear |

Ex 12
4 o/5
1/21/2005

| Time | Temp | Dew Point | Humidity | Pressure | Visibility | Wind Dir | Wind Speed | Gust | Precip | Events |
|---|---|---|---|---|---|---|---|---|---|---|
| 5:54 PM | 75.0 °F / 23.9 °C | 59.0 °F / 15.0 °C | 57% | 30.10 in / 1019.2 hPa | 10.0 miles / 16.1 kilometers | West | 10.4 mph / 16.7 km/h | - | N/A | Clear |
| 6:54 PM | 75.0 °F / 23.9 °C | 59.0 °F / 15.0 °C | 57% | 30.09 in / 1019.0 hPa | 10.0 miles / 16.1 kilometers | SW | 10.4 mph / 16.7 km/h | - | N/A | Clear |
| 7:54 PM | 72.0 °F / 22.2 °C | 60.1 °F / 15.6 °C | 66% | 30.10 in / 1019.1 hPa | 10.0 miles / 16.1 kilometers | SW | 6.9 mph / 11.1 km/h | - | N/A | Clear |
| 8:54 PM | 69.1 °F / 20.6 °C | 61.0 °F / 16.1 °C | 75% | 30.11 in / 1019.5 hPa | 10.0 miles / 16.1 kilometers | SW | 9.2 mph / 14.8 km/h | - | N/A | Clear |
| 9:54 PM | 66.9 °F / 19.4 °C | 61.0 °F / 16.1 °C | 81% | 30.12 in / 1020.0 hPa | 9.0 miles / 14.5 kilometers | WSW | 11.5 mph / 18.5 km/h | - | N/A | Clear |
| 10:54 PM | 64.9 °F / 18.3 °C | 61.0 °F / 16.1 °C | 87% | 30.13 in / 1020.2 hPa | 7.0 miles / 11.3 kilometers | WSW | 9.2 mph / 14.8 km/h | - | N/A | Clear |
| 11:54 PM | 64.9 °F / 18.3 °C | 61.0 °F / 16.1 °C | 87% | 30.14 in / 1020.4 hPa | 6.0 miles / 9.7 kilometers | WSW | 10.4 mph / 16.7 km/h | - | N/A | Mist |

### Astronomy

| Sunrise: | 05:11 AM (EDT) | Moon Rise: | 12:17 AM (EDT) 6/7 |
|---|---|---|---|
| Sunset: | 08:21 PM (EDT) | Moon Set: | 09:53 AM (EDT) 6/7 |

Moon Phase

**Jun. 07** Jun. 09 Jun. 17 Jun. 25 Jul. 02

more...

Copyright © 2005 The Weather Underground, Inc.