UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------------------------)
UNITED STATES OF AMERICA,        )
                                 )
vs.                              )    CRIMINAL ACTION
                                 )    NO. 04-40019-FDS
ALEXIS MORALES,                  )
        Defendant                )
------------------------------------------------------)

**DEFENDANT'S REPLY TO GOVERNMENT'S SUPPLEMENTAL MEMORANDUM**

Now comes the Defendant in the above-entitled matter and submits this reply to the *Government's Memorandum Following an Evidentiary Hearing to Determine Defendant's Motion to Suppress Evidence*. For the reasons set forth below, the Court should allow the Defendant's motion to suppress.

I. **THE GOVERNMENT HAS FAILED TO DEMONSTRATE THAT OFFICER CARMODY'S TESTIMONY IS CREDIBLE.**

   **A. Being a Police Officer does not mean that the witness is credible.**

The Government resorts to prosecutorial vouching, a practice shunned at trial, by arguing that since Officer Carmody is a "ten year veteran" with a "long career ahead of him" that it is "implausible" that he would "jeopardize his integrity and his career by lying." This argument demonstrates naiveté on behalf of the Government by believing and asserting that police officers simply do not lie. The fact that officers engage in "testilying," especially during suppression hearings, is well documented. *See Commission to Investigate Allegations of Police Corruption and the Anti- Corruption Procedures of the Police Dep't, City of New*

1

*York, Commission Report* 36 (1994) (Milton Mollen, Chair) ("Several officers also told us that the practice of police falsification in connection with such arrests is so common in certain precincts that it has spawned its own word: 'testilying.'"); *See also* Slobogin, Christopher, <u>Testilying: Police Perjury and What to Do About It</u>, University of Colorado Law Review, 67 U. Colo. L. Rev. 1037 (1996). The Government's assertion is particularly surprising given the sheer number of incidents within the last few years in which police officers have been disbelieved by the Court or charged and convicted of perjury in Massachusetts alone. The examples are abundant:

(1) In September of 2003, Judge Ralph D. Gants of the Worcester Superior Court ruled that Worcester Police Sgt. Timothy O'Connor committed perjury during not one, but two, distinct motions to suppress;[1]

(2) Boston Police Officers Joseph Polito and Joseph LeMoure were indicted and convicted of perjury, obstruction, and witness tampering, for attempting to cover up an assault on a teenager;[2]

(3) Detective Yves Dambreville was suspended and charges were dropped against two young men after it was revealed that he lied about a photo array identification during a pre-trial hearing under oath.[3]

(4) In January of 2003 Brockton Police Officer David J. Alexis pled guilty to perjury and obstruction of justice for faking his own shooting and accusing an innocent man.[4]

(5) In 1998 Boston Police detectives Hugo Amate and Carlos Luna were convicted of perjury for falsifying the existence of an informant in order to obtain a search warrant, resulting in the death of a fellow officer during the subsequent raid.[5]

While not every police officer lacks credibility, the mere fact that someone is a police officer entitles him to no special treatment or benefit of credibility. The evidence presented at the motion to suppress hearing, including the internal inconsistencies in Officer Carmody's

---

[1] *Judge rules Officer lied*, Murray, Gary, printed in Worcester Telegram and Gazette, September 18, 2003.
[2] *Two Boston Police Officers Convicted in Coverup*, Murphy, Shelley, printed in Boston Globe, October 26, 2004.
[3] *Charges Dismissed for cop's alleged lie*, Weber, David, printed in Boston Globe, January 21, 2005.
[4] *Brockton Cop sentenced to year in jail*, Wedge, Dave, printed in Boston Herald, January 4, 2003.
[5] *Judge Denies Detective New trial Upholds Conviction for False Search Warrant in Fatal Raid,* printed in the Boston Globe, November 9,1994.

2

recounting of the events, as well as the viewing of Andrews' SUV, provides evidence that Officer Carmody was being less than truthful. As suggested during oral argument, Officer Carmody may have guessed that Aponte was in the car, he may have confused Morales with Aponte, or he may have simply wanted to stop Morales and Andrews to see what they were doing. While there may not be definitive evidence as to why Officer Carmody was less than truthful, the evidence still remains that he was not candid with the Court about his ability to view Aponte in the back seat.

> **B. The view conducted does assist the Court in determining the credibility of Officer Carmody.**

While the viewing is not an exact replica of the conditions as they existed on June 7, 2004, they certainly do assist the Court in judging Officer Carmody's credibility and are not "grossly different" from the real stop. The Government points to the following to suggest that the viewing conducted was inappropriate:

1. *The viewing was during one of the shortest days, while June 7th was one of the longest days.* This fact is not particularly relevant given the fact that the stop occurred at 7:20pm, merely one hour before sunset on June 7th 2004. Thus the number of hours in the day or the speculative nature of the weakness of the "sun rays" is not particularly relevant.

2. *There were shadows being cast on the SUV by the multi-story buildings.* An examination of Exhibit 7 and 8 demonstrate that there are multi-story buildings and large trees along Laurel Street also, which cast shadows onto the street and car.

3. *Vantage point: higher looking down into the SUV.* The testimony of Officer Carmody was that he was 10 feet away from the car at the moment that he saw Aponte in the back seat. The Court was standing ten feet away when it made the observations of the interior of the SUV. This would adequately compensate for any height differences since Officer Carmody was sitting in a vehicle.

4. *Changes in position of the SUV vis-à-vis the sun and buildings.* The testimony was that the car was stopped or parking at the time of the viewing. The

3

>    Government offers nothing but rank speculation that there would be some change of the position of the sun to attempt to support Officer Carmody's testimony.
>
> 5.   *Nothing but a viewing on June 7 would suffice*. This last request, placed in a footnote, is as absurd as suggesting that the only way to truly judge a witness' credibility would be to have them connected to a lie detector whenever they testify. Viewings are held with regularity, witnesses are shown pictures of locations on days other than when the incident occurred, and witnesses often describe locations. Certainly the Government had an opportunity, during rebuttal, to explain how it was that Officer Carmody could see into the back seat of the car. During his rebuttal testimony, the Government elected to ask Officer Carmody just two questions: whether the lighting conditions were different, and how so. Officer Carmody only stated that on June 7th, 2004 it was "brighter" than on January 18, and that there was "an eight-story or some odd building right next to where the Mountaineer was" that was not present on June 7th, 2004. (Tr. 2:83). Since Carmody explained the differences between his ability to view on June 7, 2004 and January 18, 2005, then the Court can properly consider the viewing.

None of these points warrant excluding the view. Rather, the Court should accept the view that took place on January 18, 2005 and the findings made by the Court thereafter, and employ those to analyze Officer Carmody's credibility.

## II.   ANDREWS' TESTIMONY WAS CREDIBLE

The Government attempts to portray Andrews as someone who is "biased" in favor of the Defendant and who would risk being charged with perjury to protect him. Andrews testified that he is friends with both the defendant and Aponte. His testimony revealed that he was not close to either individual. (Tr. 2:58). The Government assumes that Andrews would be willing to miss two days of work and commit perjury to help out a person whom he never hangs out with by himself and whom he has not spoken to in 6 months. The Court certainly had an opportunity to view Andrews' demeanor during the hearing and his displeasure in having to return a second day. Andrews' demeanor during the hearing demonstrated that he did not enjoy being at Court or being made to testify in favor of one friend (Morales) while hurting another (Aponte).

4

Andrews' testimony should be credited; he has nothing to gain by committing perjury. The police and the Government, on the other hand, run the risk of losing their case should the Court suppress any evidence or statements made. Andrews' testimony was not the result of any "careful probing" by defense counsel to "help a childhood friend" as the Government alleges,[6] but rather was the recounting by a percipient witness of the events of June 7, 2004. He gains nothing but an enemy of Mr. Aponte, a known felon, as well as the wrath of the Worcester Police Department by testifying in the manner that he did.

### III. LOPEZ'S ORDER TO MORALES TO "WAIT" IS A SEIZURE FOR CONSTITUTIONAL PURPOSES.

"A person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). When the officer's conduct or "questioning is so intimidating, threatening, or coercive" that a reasonable person would not feel free to leave, then that person has been "seized." *Bostick v. Florida*, 501 U.S. 429, 434-35 (1991). "Circumstances that might indicate when an encounter becomes a seizure include the "threatening presence of several officers ... or the use of language or tone of voice [which] indicat[es] that compliance with the officer's request [will] be compelled." *See Id*. The appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter. *Bostick*, 501 U.S. at 436. The Supreme Court has consistently held that "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person

---

[6] The government's attempt to paint Andrews as a close friend of Morales in not supported by the record. Andrews testified repeatedly, and consistently, that he was not close to either Morales or Aponte. (Tr. 1:121-122; Tr. 2:37-28; Tr. 2:57-58)

that he was not at liberty to ignore the police presence and go about his business.'" *Bostick*, 501 U.S. at 437 (internal citation omitted).

A commonsense view of the situation as it took place on June 7th, 2004 clearly demonstrates that Morales was not at liberty to "ignore the police presence" and leave. He was removed from the car. There were four police officers present; the officers were armed. Morales was pat down by one officer immediately upon being removed from the car, and was ordered by Lopez to "go wait over there." Any reasonable, innocent person upon being told to wait by an armed police officer under theses circumstances would not have felt free to leave.

### IV.     MORALES' STATEMENTS ARE "FRUITS" OF HIS ILLEGAL SEIZURE AND MUST BE SUPPRESSED

The protections provided by the Fourth Amendment right to be free from search and seizure is distinct from the Fifth Amendment right to not bear witness against one self. However, the U.S. Supreme Court in *Brown* emphatically held that a violation of one's Fourth Amendment rights could result in the suppression of post-*Miranda* statements. The Court noted:

> " The exclusionary rule, however, when utilized to effectuate the Fourth Amendment, serves interests and policies that are distinct from those it serves under the Fifth. It is directed at all unlawful searches and seizures, and not merely those that happen to produce incriminating material or testimony as fruits. In short, exclusion of a confession made without Miranda warnings might be regarded as necessary to effectuate the Fifth Amendment, but it would not be sufficient fully to protect the Fourth. Miranda warnings, and the exclusion of a confession made without them, do not alone sufficiently deter a Fourth Amendment violation."
> *Brown*, 422 U.S. 590 at 600.

While the holding in *Brown* controls in this case, the Government mischaracterizes the holding of the case. In *Brown*, the police officers conducted an illegal arrest of the defendant

6

at 7:45pm. *Brown*, 422 U.S. at 592. One hour later the Defendant, now at the police station, signed a Miranda waiver form and gave several incriminating statements to the police. *Brown*, 422 U.S. at 593. The Court held that the statements made at the station an hour later must be suppressed as fruits of the illegal arrest. *Brown*, 422 U.S. at 604. The Court specifically rejected the argument that reading the defendant his Miranda rights constituted an intervening act that attenuated the taint. *Brown*, 422 U.S. at 604-605. The Court noted that in some limited circumstances, a subsequent confession could be so attenuated as to dissipate any taint of the illegal detention. *Brown*, 422 U.S. at 598. In doing so, the Court noted that in *Wong Sun*, one of the defendant's statements was admissible as the defendant there had been illegally arrested, but subsequently was arraigned, released, and a few days later returned to the police station voluntarily and made the admissible statement. *See id*. Under these circumstances, the Court held that the taint of the illegal arrest was sufficiently attenuated as to admit the statements made at the station. *See id.* That scenario is far from present here.

Morales was illegally detained after being removed from the car and pat frisked. He was not able to leave the area, but was required to wait. He was then handcuffed and forced to sit on the ground while the police searched the car. While handcuffed and being detained by the police, he made the first incriminating statement. Within an hour, he was at the station signing a Miranda waiver and making further incriminating statements. This situation is similar to that in *Brown* in both scenario and time frame to find that the taint of Morales' illegal seizure had not dissipated in the short time between his detention and the making of the statements.

## CONCLUSION

In conclusion, the Court should find that he Government has failed to establish the legality of the warrantless stop and seizure of the Defendant. As such the Court should allow the Defendant's motion and suppress the appropriate evidence.

        Respectfully submitted,
        ALEXIS MORALES,
        By his attorney,


        _____"Eduardo Masferrer"_____
        Eduardo A. Masferrer
        B.B.O.# 644623
        Masferrer & Hurowitz, P.C.
        6 Beacon Street, Suite 720
        Boston, MA 02108
        (617) 531-0135

CERTIFICATE OF SERVICE

I, Eduardo Masferrer, certify that on this 31st day of January, 2005, I served a copy of the above Response to A.U.S.A. David Hennessy via facsimile and first class mail.

\_\_\_"Eduardo Masferrer"_____
 Eduardo Masferrer