# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

—————————————————————  )
                                                          )
**UNITED STATES OF AMERICA,**        )
                                                          )
**v.**                                                    )
                                                          )          **Criminal Action No.**
**ALEXIS MORALES,**                          )          **04-40019-FDS**
                                                          )
         **Defendant.**                            )
—————————————————————  )

## MEMORANDUM & ORDER

**SAYLOR, J.**

Defendant Alexis Morales is charged under 21 U.S.C. § 841 with possession with intent to distribute 27.92 grams of crack cocaine. The drugs in question were discovered after Worcester police officers stopped a vehicle in which Morales was traveling as a passenger. Morales confessed to ownership of the drugs at the scene of the vehicle stop and later at a police station, after receiving Miranda warnings. Morales now moves to suppress the drugs and all inculpatory statements he made to the police on grounds that this evidence was obtained in violation of his rights under Fourth Amendment of the United States Constitution.

Specifically, Morales contends the statements and the drugs should be suppressed because:

(1) the police lacked reasonable suspicion to stop the vehicle in which he was traveling;

(2) the police unlawfully seized him after the stop while they arrested another passenger of the vehicle; and

(3) all statements he made to the police and all evidence found in the vehicle were the fruit of the unlawful stop, or alternatively, the fruit of the unlawful seizure of his person, and, as such,

are inadmissible.[1]

On January 18 and 19, 2005, the Court held an evidentiary hearing on defendant's motion. In addition to hearing testimony from two of the arresting officers and from the driver of the vehicle, the Court conducted a view of the vehicle. Set forth below are the Court's findings of fact and conclusions of law, together with an explanation for factual findings pertinent to those conclusions.

## I.    Findings of Fact

On June 7, 2004, at 7:20 p.m., Officers Ngoc Vo, Christopher Panarello, James Carmody, and Miguel Lopez of the Worcester Police Department were on a routine motor vehicle patrol on Laurel Street in Worcester, Massachusetts. At least two of the officers were members of the department's gang unit. Carmody Affidavit, ¶ 3; Transcript, 1-70. The officers had no specific mission at the time, other than to patrol the area. Transcript, 1-9. It was still daylight, as the sun would not set until approximately 8:22 p.m.[2]

Laurel Street is a two-way city street, a portion of which winds through a dense cluster of multi-family dwellings in an area of Worcester called Plumley Village. Carmody Affidavit, ¶ 6. The part of Laurel Street that passes through Plumley Village runs on an incline; a car traveling up the hill and away from Main Street in Worcester is headed eastbound, and a car traveling down the hill and toward Main Street in Worcester is headed westbound. Transcript, 1-10, 1-123.

---

[1] Defendant has not moved to suppress any of his inculpatory statements on Fifth Amendment grounds. *See Oregon v. Elstad*, 470 U.S. 298, 309 (1985) (holding that the Fifth Amendment does not require suppression of a confession, made after proper *Miranda* warnings, solely because the police had obtained an earlier voluntary but unwarned admission from the suspect).

[2] The Court takes judicial notice of the fact that the sun set in Worcester at approximately 8:22 p.m. on June 7, 2004. U.S. Naval Observatory, Astronomical Applications Department, *available at* http://aa.usno.navy.mil/.

The officers were riding in an unmarked Ford Taurus sedan. 1-9. Officer Panarello was the driver of the Taurus; Officer Carmody was seated in the rear left-hand side behind Officer Panarello. 1-10, 1-16. Officers Vo and Lopez were seated on the passenger's side of the car, although it is unclear who sat in the front and who sat in the rear on the passenger's side. 1-73.

At the time in question, the police car was traveling west (downhill) down Laurel Street in Plumley Village at a very low rate of speed. 1-10.[3] On the left side of the street was 29 Laurel Street and an open courtyard; on the right side of the street was multi-family housing and a convenience store. 1-10, 1-11, Exhibits 7, 8. There were a number of people outside in the area. Carmody Affidavit, ¶ 7.

As the police car proceeded down the hill, Carmody noticed a white Mercury Mountaineer sport utility vehicle a short distance down the street, traveling in the opposite direction. Transcript, 1-12. The Mountaineer was moving at approximately 3-5 miles per hour, and was slowing down and preparing to come to a stop at 29 Laurel Street. 1-73, 1-12. The driver and owner of the Mountaineer was Darren Andrews. 1-123.

Defendant Alexis Morales was seated in the front passenger's seat of the Mountaineer, and Raul Aponte was seated in the back seat behind Morales. *Id.* The Mountaineer had bucket seats in the front, so that there was a space between the front driver's and passenger's seats. Officers Lopez and Carmody knew Morales and Aponte. Both officers had been involved in previous arrests of Morales and Aponte, and were aware of Morales's membership in a gang known as "Plumley Village East" ("PVE"). 1-63-65, 1-71-72, 1-86-87. At the time, there was a "execute

---

[3] Officer Carmody testified that the police was traveling at about 10 miles per hour; Officer Lopez testified that it was traveling between 10 and 20 miles per hour. 1-12, 1-74.

without delay" warrant ("EWOD warrant") out for Aponte's arrest.  Carmody and Lopez were aware of this arrest warrant.  1-59, 1-85.

When the Mountaineer and Taurus were about 10-12 feet apart, Carmody observed Aponte through the front windshield of the Mountaineer.  1-60.  From his vantage point, Carmody was able to see Aponte's face and upper-chest.  1-57.  Carmody also saw Morales and he and Andrews made eye contact as the two cars approached and passed one another.  Carmody Affidavit, ¶ 8; Transcript, 1-84, 1-124.

As the cars passed each other, Carmody announced to the other officers that Aponte and Morales were in the Mountaineer.  Transcript, 1-60, 1-84.[4]  He instructed Panarello to turn the police car around and to stop the Mountaineer.  Id.  Panarello made a u-turn on Laurel Street, so that the police car was facing east, and drove up to the Mountaineer, which had already come to a stop at the curb in front of 29 Laurel Street.  1-61.  Panarello parked directly behind the Mountaineer at about a half to a full car's length away.  2-22.   The process of reversing the police car took only five to ten seconds.  1-60.

All four officers exited the police car and approached the Mountaineer from the rear. Lopez and Carmody walked to the passenger's side.  Lopez reached the car before Carmody and went to the front passenger seat area.  1-18, 1-74.  At the time they exited the car, only Carmody, among the officers, knew where in the vehicle Aponte and Morales were seated.  1-18.  Panarello walked to the driver's side of the vehicle; it is unclear where Vo went upon exiting the police car.

---

[4] Carmody testified that he said, "Raul's in that car.  Spin around."  1-60.  Lopez testified that Carmody stated "Raul Aponte's in that car.  Stop that car." 1-84.  Lopez also testified that Carmody stated that Morales was in the car.  Id.  Carmody's affidavit states that he also identified Morales, but he did not testify to that effect at the hearing.  Carmody Affidavit, ¶ 8.

1-25.

Lopez approached the passenger's side of the Mountaineer from the curb.  1-74, 1-75.  He testified that as he approached, he observed movement between the individuals sitting in the front and back passengers' seats through the passenger side windows.  1-74, 1-75, 1-88.[5]  Specifically, he stated that he saw the individual in the front passenger's seat move toward the back, as if to hide something, or to give something to the person in back, or possibly to receive something from that person.  1-88, 1-89.  He also observed movement from the individual in the back seat.  1-88.

Carmody exited the police car from the back driver's side seat and walked toward the back of the Mountaineer.  He testified that as he approached, he observed "activity in between [Morales] and the rear passenger" through the rear window.  1-16.  Specifically, he saw that "the figure in the front passenger seat [Morales] was turning back towards the figure in the back right behind him in the rear passenger seat [Aponte]."  1-17, 1-61.  Carmody then walked along the back of the Mountaineer to the passenger's side, where Lopez was already standing.  1-74.

Lopez physically removed Morales from the vehicle.[6]  He then conducted a pat-down of Morales's outer clothing.[7]  The pat-down turned up no weapons or contraband.  1-75.  During the

---

[5] The Mountaineer had tinted windows.  The window at the rear of the vehicle and the rear side windows were tinted so as to make them somewhat reflective, and partially opaque, from the outside under certain lighting conditions.  The windshield and front side windows were tinted green, but were neither reflective nor partially opaque.

[6] Lopez testified that he opened the front passenger door; Carmody testified that Morales was already opening the door when Lopez approached it.  1-19, 1-75.

[7] Andrews, the driver, testified that the entire pat-down lasted 3-4 minutes.  1-127.  Carmody testified that the removal and pat-down lasted 20-30 seconds.  1-58.

pat-down, Aponte and Andrews remained seated in the Mountaineer.[8]  Carmody stood near the

door of the back seat watching Aponte.  1-20, 1-91.

When Lopez completed the pat-down, he told Morales to "go wait over there," or "go

stand over there."  1-90, 1-22.  He did not instruct him to stand or wait in any particular place or

point to any particular place.  1-90, 1-91.  He did not handcuff or arrest Morales at that time.

1-91, 1-75, 1-76.  Morales walked to a location approximately five to eight feet behind Officer

Carmody.  1-25.  Officer Vo stood near the back end of the Mountaineer and watched Morales.  1-

58.[9]

Next, Lopez opened the back passenger's side door in order to remove Aponte from the

vehicle.  1-76.  Carmody stood nearby.  When Lopez opened the door, Aponte leaned away from

the officers and concealed his hands from their view.  1-25, 1-26, 1-76.  Carmody ordered Aponte

to show his hands.  1-26.  Lopez then physically removed Aponte from the vehicle; Aponte did not

resist.  1-92.[10]  Vo continued to watch Morales while Lopez and Carmody dealt with Aponte.

Panarello remained on the opposite side of the Mountaineer.  1-27.

During the process of removing Aponte from the vehicle, Lopez's face came within two or

---

[8] Andrews testified that a police officer was yelling to Aponte to stop moving as soon as Morales was out of the car.  1-128.

[9] Andrews testified to a somewhat different version of events.  He testified that an officer took Morales to the back of the Mountaineer and placed him on the curb between the Mountaineer and the police car.  1-127.  He initially testified that, through his rear view mirror, he saw an officer take Morales to the curb and place him on the curb behind the Mountaineer, and that he saw Morales sitting on the curb through the rear view mirror.  He later testified that he saw the officer and Morales walking, and that when he could no longer see them, he knew Morales had been placed on the curb.  At this point he also added that he heard an officer say "sit on the curb."  2-42, 2-63.  For the reasons stated below, the Court concludes that Morales was detained under either scenario, whether or not he was ordered to sit on the curb.

[10] Carmody testified that he and Lopez removed Aponte from the vehicle.  1-27.

three feet of a pocket on the rear of the front passenger's seat.  1-77.  The pocket was hanging

slightly open.  *Id.*  Inside the pocket, Lopez observed a clear plastic sandwich-size bag containing a

chunk of off-white, rock-like substance which he immediately believed to be crack cocaine.  *Id.*[11]

Once Aponte was outside the car, Lopez patted him down.  Aponte was then arrested,

handcuffed, and placed on the curb behind the Mountaineer and in front of the police car.  *Id.*

Throughout the search and arrest of Aponte, Morales remained several feet away from the police

officers.  1-28.

After Aponte had been placed on the curb, Lopez alerted Carmody to the presence of the

plastic bag in the pocket behind the front seat.  1-32, 1-94.  Carmody looked through the opening

at the top of the pouch and observed the plastic bag.  1-34.  He recognized the contents of the bag

as crack cocaine.  1-45.  Lopez then reached into the pocket, removed the bag, and handed it to

Carmody. 1-38.  After receiving the drugs, Carmody gave an arrest signal to the other officers.  1-

40.

Morales was arrested and placed in handcuffs.   1-40, 1-94.  One of the officers also

verbally instructed Panarello to remove Andrews from the driver's seat of the Mountaineer.

Panarello patted-down Andrews and placed him under arrest.  1-77.[12]  Andrews and Morales were

then placed on the curb with Aponte, between the Mountaineer and the police car.  *Id.*  Andrews

was seated furthest away from the Mountaineer and closest to the police car; Morales and Aponte

---

[11] Carmody testified that the drugs were broken up into several pieces when they were found.  1-29, 1-30.
Lopez testified that he "thinks" the substance was in one piece, but also said he did not know if it was packaged
individually.  1-93.

[12] Andrews testified that he and Morales were not placed in handcuffs until after the officers searched the
entire vehicle.  1-130, 2-16.

were seated next to one another.  1-44, 1-130.

    While holding the plastic bag containing the drugs, Carmody stated to the other officers "we've got crack."  1-45.  Morales and Andrews started complaining and demanding to know the reason for their arrest.  2-24.[13]  One of the officers then approached them and held out a piece of paper or cardboard with the drugs on it.  2-25.  In response, Andrews said something along the lines of "What the hell is that?"  2-26.  The police ordered all three men to remain quiet; however, Aponte disregarded this order and spoke to Morales.  *Id.*[14]  For the most part, Aponte communicated to Morales in Spanish; Andrews did not speak Spanish and did not understand most of what Aponte said to Morales.  2-27.

    At some point after Andrews and Morales were placed on the curb, the officers searched the entire Mountaineer for drugs.  1-83.  Most of this search was performed by Lopez.  2-72.

    While the three men were sitting on the curb, Andrews's mother approached the scene, attempting to reach her son, and demanding an explanation for his detention.  1-45, 2-28.[15] Carmody instructed her to stop when she was about seven or eight feet away from the three men in custody, and ordered her to stand back while they completed their job.  1-45.

    When his mother arrived at the scene, Andrews began to repeatedly state, "I'm not taking this.  I'm not taking this."  1-47.  He also stated, "This isn't my stuff.  I'm not going down for this.

---

[13] Andrews testified that he asked Carmody why they were pulled over and that Carmody replied that it was because he did not have a valid license.  1-132.  According to Andrews, Carmody later said that the car was stopped because there was a warrant out for Aponte's arrest.  *Id.*

[14] According to Andrews, Aponte told Morales that the object in the plastic bag was a "quake," a slang word meaning 7 grams of crack.  2-33.

[15] At the time, Andrews lived at 29 Laurel Street with his mother and his sister.  1-118.

That's not mine," and repeatedly demanded that the owner of the drugs confess. 1-78, 1-96, 2-28.[16]

In the meantime, Aponte continued to talk to Morales. 2-28, 2-29.[17] Morales then told Lopez, "That shit's mine," and "They had nothing to do with it. It's all mine." 1-49, 1-78, 2-31.[18] Lopez or Carmody then asked Morales if he would sign a written statement of admission that the drugs belonged to him; Morales agreed to do so. 1-51, 1-78.[19]

The officers then released Andrews from custody, and radioed for a Worcester Police Department transport wagon. 1-53. A while later, the transport wagon arrived at the scene, and carried Morales and Aponte to the police station, which is approximately 1000 feet from the end of Laurel Street. 1-82. Upon arrival, Morales was taken to the gang unit office of the department for questioning. 1-78. He was read Miranda rights and given a Police Department-issued Miranda-warning card. *Id.* Morales signed this card at 8:45 p.m. Exhibit 1. Lopez and Panarello also signed the card. Transcript, 1-80. Morales then answered questions asked by Lopez in a cooperative manner and signed a written statement of admission to ownership of the drugs. 1-81, 1-102.

---

[16] Andrews testified that Carmody then said something along the lines of "whoever's it is, fess up." 2-30.

[17] According to Andrews, Aponte was asking Morales to do something in a "pleading" tone of voice. 2-28. Specifically, Andrews recalls Aponte saying "come on, I've got cases"; Aponte apparently made this statement in English. 2-29. According to Andrews, Morales became visibly aggravated because Andrews was continuously talking into one ear while Aponte was talking into the other. 2-30.

[18] Carmody testified that, in response, he said, "Alexis, what did you say?" 1-50. Morales repeated the statement, "That shit's mine," and Carmody responded, "Alexis, it's not that easy." *Id.*

[19] Andrews testified that, upon hearing Morales' admission, Aponte stopped talking and Andrews shook his head at Morales as if to say, "What are you doing?" 2-32. Andrews also testified that Lopez told Morales that he knew the drugs were not his, and that one officer said that if Morales was willing to make a statement to this effect, they would release Andrews. 2-35, 2-36.

## II.     Conclusions of Law

### A.     The Constitutionality of the Vehicle Stop

The threshold issue in this matter is whether the police had a constitutional basis for stopping the automobile in the first instance. The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Constitution, Amendment IV. It is well-settled that a police stop of a moving vehicle constitutes a seizure of all of the vehicle's occupants within the meaning of the Fourth Amendment. *United States v. Woodrum*, 202 F.3d. 1, 5 (1st Cir. 2000).[20] Thus, if the initial stop of a vehicle is unreasonable, the evidence seized and statements obtained by virtue of that stop may, under some circumstances, be excluded as "fruit of the poisonous tree." *See United States v. Kimball*, 25 F.3d 1, 5 (1st Cir. 1994); *Wong Sun v. United States*, 371 U.S. 471, 484-485 (1963).[21] A vehicle stop is reasonable under the Fourth Amendment if it is premised on reasonable suspicion that the vehicle's occupants were, are, or will be engaged in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 30, (1968); *Kimball*, 25 F.3d at 5. The government bears the burden of proving the constitutionality of the vehicle stop by a preponderance of the evidence. *See Missouri v. Seibert*, 124 S. Ct. 2601, 2608 n.1 (2004).

Here, the government contends that Officer Carmody's identification of Aponte in the

---

[20] The Mountaineer had come to a stop by the curb before the police parked behind it and approached it. However, the government refers to the police conduct as a "stop" because the police approached the Mountaineer and would not have permitted it to drive away. Opposition Memorandum, p. 6 n.2.

[21] There is no dispute that defendant's Fourth Amendment interests were affected by the actions of the police and that he may, therefore, challenge the constitutionality of the *stop* of Andrews's vehicle. *See United States v. Kimball*, 25 F.3d 1, 5 (1st Cir. 1994). Under *Rakas v. Illinois*, a passenger does not have the legitimate expectation of privacy necessary to challenge the *search* of an automobile. 439 U.S. 128, 148-149, 432-433 (1978). However, the passenger may attempt to suppress contraband seized by virtue of an allegedly unlawful vehicle stop under the fruit of the poison tree doctrine. *Kimball*, 25 F.3d at 5-6, 6 n.3.

Mountaineer gave the police reasonable suspicion to stop the vehicle.  Defendant concedes that, *if* Carmody in fact made this observation, the police had such reasonable suspicion, because the police knew that there was a warrant out for Aponte's arrest.  Defendant's Memorandum, p. 2 ("As a general matter, the decision to stop a vehicle is reasonable where the police have probable cause to believe one of its occupants is wanted for an outstanding warrant").  The constitutionality of the stop, therefore, hinges upon the credibility of Carmody's testimony that he observed Aponte in the vehicle.

Carmody testified that, looking through the front windshield of the Mountaineer, he saw Aponte seated in the rear seat as it slowly moved up Laurel Street, and immediately announced "Raul's in that car.  Spin around."  1-60.  Defendant argues, in essence, that Carmody could not have seen Aponte through the windshield, and that therefore his testimony (and the corroborating testimony of Lopez) is necessarily a fabrication.  First, defendant argues that the physical evidence proves that Carmody could not have seen Aponte through the windshield.  Second, defendant attacks Carmody's credibility, based on multiple alleged inconsistencies or implausibilities in his testimony.  The Court will consider each contention in turn.

### (1)     The Physical Evidence

Defendant first argues that it was impossible, or at least highly implausible, for Carmody to have spotted Aponte in the back seat of the Mountaineer in the manner he described.  Ordinarily, of course, occupants of a vehicle moving in one direction are not readily visible to those passing in the opposite direction.  Here, however, there are multiple reasons to conclude otherwise, and to credit the testimony of Carmody and Lopez.

First, both vehicles were traveling at a very slow rate of speed.  The police car was

traveling at approximately 10 miles per hour (according to Carmody) or 10 to 20 miles per hour (according to Lopez). The Mountaineer was traveling at approximately 3 to 5 miles per hour, and preparing to come to a complete stop at 29 Laurel Street.[22]

Second, Carmody was not driving. He was seated on the left side of the vehicle, nearest the Mountaineer. As an officer on patrol on a city street, he had every reason to be looking intently at the people and objects around him.

Third, the episode occurred during daylight hours; the sun did not set in Worcester on June 7, 2004 until 8:22 p.m., approximately one hour after the vehicle stop.[23]

Fourth, and perhaps most significantly, Andrews – the driver of the Mountaineer – testified that he could see the faces of all four officers in the police car, and indeed that he made eye contact with Carmody, as the two vehicles passed each other. 1-124. Andrews also said something along the lines of "look at the cops" as the vehicles came into close proximity. *Id*. In essence, therefore, Andrews had a similar experience to Carmody: he recognized individuals in the oncoming vehicle and announced whom he had seen to the other occupants of his vehicle.

Defendant, however, argues that the evidence shown to the Court during a view of the Mountaineer discredits, or substantially undermines, Carmody's testimony. In essence, defendant argues that because the Court could not see someone seated in the rear seat during a demonstration conducted at the view, Carmody likewise could not have seen Aponte seated in the same position on June 7, 2004.

---

[22] The Court is conscious of the fact that numerical estimates of speed are notoriously unreliable. It is nonetheless undisputed that the Taurus was traveling slowly and the Mountaineer was traveling *very* slowly and coming to a stop.

[23] For the reasons set forth below, however, the Court cannot make any conclusions as to the precise level of light or visibility inside the vehicle.

The view was conducted on January 18, 2005 between 4:25 and 4:30 p.m., on Main Street in downtown Worcester outside the courthouse.[24]  At the view, defense counsel orchestrated a demonstration in which the Court was asked to look through the windshield of the Mountaineer from an angle approximately ten to twelve feet in front of the car and about two or three feet to the side of the car on the driver's side.  Andrews sat in the driver's seat of the vehicle and defendant's private investigator, Robert Diaz, sat in the rear passenger's seat, approximately where Aponte was seated on June 7, 2004.[25]  From this vantage point, the Court was able to see the face of Andrews in the front seat.  The Court could not see the face of Diaz.

Defendant maintains that Carmody's testimony should be discredited based on the Court's inability to discern Diaz at the view.  The circumstances of the view, he argues, were sufficiently similar to the circumstances on June 7, 2004, to cast substantial doubt on Carmody's capacity to observe Aponte.  Specifically, defendant argues that, on both dates, "the sun was not directly visible in the sky, the Mountaineer was parked with the sidewalk on the passenger's side of car, and there were buildings and obstructions on either side on [sic] the car on Main Street (buildings), and on Laurel Street (housing complex and trees)."  Supplemental Memorandum, p. 5.  Moreover, defendant underscores that "[i]n conducting the view, the court, [was] completely focused, standing still, and looking directly into the car."  *Id.*  He thus contends that the Court conducted the view under circumstances that were similar to, or even more favorable than, the circumstances on Laurel Street on June 7, 2004.

_____

[24] On direct examination, Andrews testified that he was the owner of the vehicle, and that it was the same vehicle that he owned and was driving on June 7, 2004.  He further testified that the only change made to the vehicle subsequent to June 7 was an alternation of the color from white to black.

[25] As noted, the windows of the vehicle were tinted; the windshield was not tinted with a reflective or partially opaque material, but had a slight green tint to it.

13

There is some initial appeal to the argument that, if the Court could not see the rear passenger in an automobile that was standing still, Carmody could not have seen a passenger in the same seat while the automobile was in motion.  However, the demonstration was not a sufficiently accurate re-creation of the conditions as they existed on June 7, 2004, such that the Court can rely on it to discredit the testimony of Carmody and Lopez.

First, and most importantly, Carmody's ability to discern Aponte was entirely dependent on the precise combination of light, shadow, and reflection that occurred as the two vehicles passed one another.  Based on a view that took place on one street at 4:25 p.m. on a day in January, the Court cannot conclude that the same lighting conditions prevailed at 7:20 p.m. on a different street on a day in June.

There is no evidence in the record as to the height of the sun in the sky at 7:20 p.m. on June 7.  There is no evidence as to the presence or absence of any cloud cover, any sources of reflected light, or any sources of artificial light inside or outside the car.  There is no evidence as to the precise relationship and angle of both vehicles to the sun.  There is *some* evidence as to buildings or trees in the area that may or may not have cast shadows on the street, but not enough to draw any meaningful comparisons.[26]  Furthermore, even if the evidentiary record were complete, the Court would not be able to reach any conclusions without, at a minimum, scientific

---

[26] Main Street runs roughly north and south (more accurately, north-northeast to south-southwest); Laurel Street runs roughly east and west.  The buildings on either side of Main Street during the view were obviously different from the housing complexes and trees on Laurel Street.  The buildings on Main Street were four to five stories high and separated from the passenger's side of the vehicle by only a sidewalk; the buildings on Laurel Street were separated from the curbside, at various points, by a sidewalk and a stretch of grass and landscaping, or by a courtyard.  See Defendant's Exhibit 7, 8.  There is no evidence in the record as to the height of the buildings on Laurel Street.  At the view, the vehicle was parked on the west side of Main Street, and thus the adjacent buildings blocked the afternoon sun.  There are a number of trees in that area of Main Street, but none of any significance.  It is therefore conceivable, indeed likely, that the buildings on Main Street created a greater obstruction to the afternoon sunlight than the trees and buildings on Laurel Street.

or technical expert testimony that accounted for all of the foregoing variables.

There are several other potentially important variables that might have affected Carmody's ability to discern the identity of Aponte. Both automobiles were on something of an incline, and the Taurus was therefore somewhat higher than the Mountaineer as they approached; that difference in elevation was not accounted for in the demonstration. Minor variations in the angle of the windshield in relation to the light sources and the viewer might have a dramatic impact on whether a glass reflection obscured the view. The cleanliness of the windshield might likewise make a substantial impact. The hair, skin color, and other facial features of Aponte, or his clothing, may have affected his visibility, as well as the general distinctiveness or recognizability of his face. Aponte may have been seated in any of a multitude of different postures, including leaning forward or toward the middle of the vehicle.

In summary, the view and demonstration were not a scientific re-creation of the conditions as they existed on Laurel Street on June 7, 2004. While certainly defendant has raised doubts in the Court's mind as to Carmody's ability to discern an individual in the back seat of the vehicle, there are also very substantial reasons to discount those doubts. Accordingly, the Court cannot conclude that the otherwise-credible testimony of Officers Lopez and Carmody should be disbelieved or disregarded based on its inherent impossibility or implausibility.

### (2)     The Alleged Inconsistencies in Officer Carmody's Testimony

Defendant next contends that Carmody's testimony was "not internally consistent with his knowledge that Aponte was seated in the rear passenger['s] seat" and was inconsistent with the testimony of Lopez. Supplemental Memorandum, pp. 5-6. He advances the following six arguments in an effort to impugn the veracity of Carmody: (1) "Carmody claimed that he saw

15

Aponte, even though no other officer, including Officer Lopez, saw Aponte;" (2) "Carmody

claimed to have been able to see movement from the heavily tinted rear window, even though

Officer Lopez claimed he could not;" (3) "Carmody claimed that he saw Aponte, who had an

'execute without delay' warrant, and yet did not initially arrest him, but rather had Morales

removed first;" (4) "Carmody knew Aponte from prior arrests and knew that his warrant was for a

violent offense (assault and battery) yet he did not inform the other officers where in the car

Aponte was seated;" (5) "Carmody claims that Morales is a potentially dangerous individual, yet

he leaves him to stand unguarded behind him while he removes Aponte;" and (6) Officer

Carmody's recollection that the car stop and search lasted twenty minutes is "not accurate" and "is

not supported by the testimony or evidence." *Id.* For the reasons set forth below, the Court

concludes that none of these arguments exposes any significant inconsistencies or contradictions,

and thus does not warrant rejection of Carmody's testimony.

First, it is unremarkable that neither Panarello, Vo, nor Lopez saw Aponte. Panarello was

driving, and presumably watching where he was going. Vo and Lopez were seated on the right

side of the car, and would have been unlikely to have had the same opportunity to see the inside of

the Mountaineer as Carmody.[27] In fact, it does not appear that Lopez even became cognizant of

the presence of the Mountaineer until Carmody announced that Aponte was in the vehicle. 1-84.

Carmody's testimony is also supported by Lopez, who testified that Carmody stated "Raul

Aponte's in that car. Stop that car," as the Mountaineer passed by. *Id.* Defendant points to the

fact that Lopez testified that Carmody reported that both Aponte *and Morales* were in the

---

[27] The record does not expressly indicate whether Panarello and Vo observed Aponte, but the government
does not appear to claim that they did.

Mountaineer, whereas Carmody himself testified at the hearing that he announced only that Aponte was in the vehicle. While Lopez's testimony was not identical to Carmody's in this regard, it was nevertheless consistent as to Aponte, and therefore corroborative of Carmody's claim in that respect.[28]

Second, Lopez exited the police car on the curbside and walked toward the passenger's side of the Mountaineer. It logically follows that he would have observed the movement through the side windows and not through the rear window. However, Carmody exited the police car on the driver's side, approached the rear driver's side of the Mountaineer, and crossed along the back end of the vehicle to the passenger's side; he therefore would have witnessed the movement through the tinted rear window. Moreover, the fact that both officers testified to witnessing movement between the front and back passengers tends to buttress Carmody's credibility.

It is true that the rear window, as the Court observed it on January 18, was tinted so as to make it somewhat reflective and partially opaque under certain lighting conditions. Because the circumstances of the view, particularly the lighting conditions, may not have been substantially similar to the circumstances on June 7, the Court cannot conclude that Carmody could not possibly have seen passenger movement through the window. The Court also notes that Carmody does not claim to have identified a face or other details through the rear window, but only the movement of the passenger.

---

[28] Carmody's affidavit, in contrast to his testimony, stated that he also observed Morales in the front seat. On cross-examination, Lopez was specifically questioned as to whether Carmody stated that Morales was in the Mountaineer; Lopez answered in the affirmative. However, Carmody was never asked to relate everything that he said as the police car passed the Mountaineer and turned around, nor was he specifically asked whether he told the other officers that Morales was in the Mountaineer. Furthermore, Carmody was not cross-examined as to the apparently different statement in his affidavit. Thus, it appears that the apparent discrepancy in the testimony of Lopez and Carmody may have resulted simply from the form of counsels' questioning.

17

Third, the statement that Carmody "had Morales removed first" is inaccurate; Lopez reached the passenger's side of the Mountaineer before Carmody and removed Morales without conferring with, and without instruction from, Carmody.  In any event, Lopez and Carmody were both familiar with Morales as a member of the PVE gang and had been involved in prior arrests of Morales on firearm and narcotics offenses.[29]  Moreover, both officers observed Morales turning toward Aponte as if to give him something or receive something from him.  Therefore, Lopez may have gone to the front passenger seat erroneously, believing Aponte to be there; or he may have recognized Morales and made a decision to remove him first for safety reasons.  In either case, Carmody had good reason not to object to Lopez's conduct; the removal and pat-down of Morales neutralized any potential threat he posed and cleared the way for an orderly arrest of Aponte.

Fourth, it is true that Carmody did not inform the other officers where Aponte was seated, notwithstanding the offense for which Aponte was to be arrested and Carmody's knowledge of Aponte's criminal record.  Nonetheless, events transpired at a rapid pace; within five to ten seconds of Carmody's announcement, the police car had reversed directions in order to stop the Mountaineer.  Carmody stated that he watched the Mountaineer throughout this time period.  The short time frame and his focus on the activity of the Mountaineer may explain why Carmody did not tell the other officers where Aponte was seated by the time they exited the police car.  It is also possible that he believed that he had given them adequate information by announcing that Morales and Aponte were in the Mountaineer; this made the officers aware that two potentially dangerous individuals were in the vehicle and that they should proceed accordingly.

---

[29] It is unclear whether Officer Lopez had recognized Morales through the side window by the time he reached the vehicle.

Fifth, the claim that Morales was unguarded is untrue. The uncontroverted evidence indicates that Vo, the "cover officer," kept watch on Morales while Carmody and Lopez dealt with Aponte. Furthermore, by this time, Morales had been frisked to ensure that he was carrying no dangerous weapons.

Sixth, while Carmody's recollection of the relevant time frame appears to be inaccurate, it is not significant enough to undercut the remainder of his testimony. Carmody testified that "maybe 20 minutes" elapsed between the stop of the Mountaineer and the arrival of the transport wagon. 1-54. Lopez initially testified that he did not recall how much time elapsed in this interval, and then estimated that "maybe 35 minutes or so" passed between the two events. 1-83. It is clear that the Mountaineer was stopped at 7:20 p.m., and that Morales signed the Miranda card at 8:45 p.m. Given the close proximity of the police station to 29 Laurel Street, it is highly likely that Lopez's testimony was more accurate than Carmody's on this point, and that both officers are not recalling the lapse of time with any precision.

Nonetheless, it does not follow, as defendant maintains, that the Court should discredit Carmody's claim to have seen Aponte. The Court cannot extrapolate from Carmody's apparently inaccurate estimate of the time frame that he is being completely deceitful about seeing Aponte, and the subsequent events of the traffic stop. Moreover, Carmody had no apparent incentive to be less than forthcoming about the length of the vehicle stop. It appears, therefore, that Carmody's apparently inaccurate estimation of the time frame is not significant under the circumstances.

In summary, defendant's arguments with regard to alleged inconsistencies have, at best, a *de minimis* impact on the evaluation of Officer Carmody's credibility. They certainly do not overshadow the considerable evidence in support of his testimony.

19

The most compelling reason to believe that Carmody observed Aponte in the Mountaineer on Laurel Street is that Andrews testified to the inverse:  he observed all four officers in the Taurus, and indeed made eye contact with Carmody.  For that reason, and the other reasons stated herein, the Court concludes that the officers had a reasonable suspicion to stop the Mountaineer, based on Officer Carmody's observation of Raul Aponte in the rear passenger seat.

### B.    <u>Whether Defendant Was Unlawfully Seized</u>

Morales further claims that he was unlawfully detained in the interval between his removal from the Mountaineer and his arrest following Lopez's discovery of the crack cocaine, and that his statements to the police are the fruits of that unlawful detention and should be suppressed.[30] Lopez first removed Morales from the automobile and patted him down to search for weapons. He then instructed Morales to go "wait" or "stand" in some unspecified location nearby.  Morales walked to an area approximately five to eight feet from the officers, and remained there, where he was watched by Officer Vo.[31]  The parties dispute that version of events, and further dispute whether Morales was lawfully "seized" under the Fourth Amendment after the traffic stop and prior to his formal arrest.

A seizure occurs within the meaning of the Fourth Amendment if, "in view of all the circumstances surrounding the incident," an individual reasonably believes he or she is not "free to

---

[30] There is no dispute that once Lopez discovered the drugs, the police had probable cause to arrest and detain all occupants of the vehicle.

[31] Carmody and Lopez testified to this version of events.  Defendant urges the Court to credit of the testimony of Andrews that, after Morales was removed from the Mountaineer, an officer took him to the back of the vehicle and ordered him to sit on the curb.  The Court accepts the officers' portrayal of the facts because they corroborate one another and because cross-examination of Andrews elicited inconsistencies in his testimony.  11-127, 2-42, 2-63.  Nonetheless, the Court concludes that Morales was "seized" even under the officers' version of events.

leave" an encounter with a police officer. *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988).

Morales was obviously "seized" during the pat-down. When it concluded, he was directed to

stand in a particular area, where he was watched by a police officer. A reasonable person in

Morales's position would not have felt free to leave the scene of the vehicle stop, having been

ordered by a police officer to wait or stand in the vicinity. *See United States v. Richardson*, 385

F.3d 625, 629 (6th Cir. 2004) (explaining that words alone may be enough to make a reasonable

person feel not free to leave, and holding that officer's statement "just hang out right here for me,

okay?" was enough to constitute a seizure, even though he did not display an intimidating

demeanor); *United States v. Beck*, 140 F.3d 1129, 1136 (8th Cir. 1998) ("any doubts that

[defendant] had that he was free to drive away were extinguished when . . . [the officer] ordered

[defendant] to get out of his automobile and to stand on the side of the road").

The Court accordingly holds that Morales was "seized" within the meaning of the Fourth

Amendment in the interlude between his removal from the Mountaineer and his formal arrest

following Lopez's discovery of the drugs. However, the Court further concludes that the police

officers were authorized under the Fourth Amendment to detain Morales temporarily. The

conduct of the officers was justified for two reasons: first, the circumstances of the vehicle stop

justified both the pat-down and the subsequent detention of Morales pending the completion of the

traffic stop; and, second, in the course of the vehicle stop, an independent constitutional basis

developed to pat-down and temporarily detain Morales, apart from the suspicions which initially

gave rise to the vehicle stop.

### (1)    Detention Pending Completion of the Traffic Stop

As noted, law enforcement may stop a vehicle pursuant to a reasonable suspicion that its

occupants have engaged, are engaging, or will engage in criminal activity.  *See Kimball*, 25 F.3d at 5.  Such reasonable suspicion was present in this case because Officer Carmody recognized one of the passengers of the Mountaineer as an individual with an outstanding warrant for his arrest.

In *Maryland v. Wilson*, the Supreme Court held that a police officer may order a passenger out of a vehicle that has been stopped for a speeding infraction pending the completion of the traffic stop.  519 U.S. 408, 415 (1997).  That decision broadened its previous ruling in *Pennsylvania v. Mimms*, 434 U.S. 106 (1977), that law enforcement may order the *driver* out of a vehicle that has been stopped for a traffic violation.

The *Wilson* court explained that the "touchstone" of the Fourth Amendment analysis is always the "reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Id.* at 411 (internal quotations omitted).  Reasonableness "depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Id.* (internal quotations omitted).

In finding the officer's conduct reasonable, the *Wilson* court extended the rationale behind *Mimms*.  *Id.* at 413-414.  It observed that the same weighty public interest in officer safety is present whether the vehicle occupant in question is the driver or passenger, and that the presence of more than one occupant presents additional possible sources of harm to the officer.  *Id.* at 413. The potential for violence, it continued, stems from the possibility that a more serious crime might be uncovered in the course of a traffic stop.  Outside the car, passengers, like drivers, are denied access to weapons in the vehicle's interior that might be used to prevent the discovery of a crime. *Id.* at 413-414.

On the other hand, the court recognized that infringement of the passenger's personal

liberty was greater than for the driver because there is no probable cause or reasonable suspicion to stop the *passenger* of a vehicle that has contravened traffic regulations.  *Id.* at 413.  Nonetheless, it viewed the additional intrusion on the passenger as minimal; the passenger was already stopped, and the only change was that the passenger was now outside rather than inside the vehicle.  *Id.* at 414.  The court therefore held that it was reasonable under the Fourth Amendment to order passengers out of a vehicle pending completion of the vehicle stop.

In *Wilson*, the court expressly reserved the question of whether or not an officer may *detain* a passenger for the duration of a vehicle stop, and has not had subsequent occasion to resolve this issue.  *Id.* at 415 n.3.  The First Circuit likewise has not ruled on the issue.  However, three Courts of Appeal have held, based on *Wilson*, that a police officer may detain a passenger pending the completion of a traffic stop, even without a particularized suspicion that the passenger has engaged, is engaging, or will engage in criminal activity.  *See Rogala v. District of Columbia,* 161 F.3d 44, 45-46 (D.C. Cir. 1999); *United States v. Moorefield*, 111 F.3d 10, 11-12 (3d Cir. 1997); *United States v. Clark*, 337 F.3d 1282, 1288 (11th Cir. 2003).

In *Rogala*, a police officer ordered a passenger to remain in a vehicle that had been stopped for running a red light pending the administration of a sobriety test to the driver.  The passenger was intoxicated, blocking traffic, and interfering with the sobriety test.  161 F.3d at 47, 53.  The court concluded that, "under the circumstances presented, it follow[ed] from *Maryland v. Wilson* that a police officer has the power to reasonably control the situation by requiring a passenger to remain in a vehicle during a traffic stop."  *Id.* at 53 (emphasis omitted).

In *Moorefield*, police officers stopped a vehicle for a routine traffic violation.  When the front passenger attempted to exit the vehicle, one officer ordered him to remain in the vehicle with

his hands in the air.   In view of *Wilson*, the court had "no hesitancy in holding that the officers

lawfully ordered [the passenger] to remain in the car with his hands in the air" while the traffic stop

was being conducted.  111 F.3d at 13.  "Just as the [Supreme] Court in *Wilson* found ordering a

passenger out of the car to be a minimal intrusion on personal liberty," the *Moorefield* court found

"the imposition of having to remain in the car with hands raised equally minimal."  *Id.*  The

detention was reasonable under the circumstances because "the benefit of officer protection far

outweigh[ed] [the] minor intrusion on personal liberty."  *Id.*; *see also Clark*, 337 F.3d at 1286,

1287-1288 (observing that the Supreme Court in *Wilson* approved "officer control of passengers in

a traffic stop" based on the "legitimate and weighty" need for officer safety, and holding that,

although the officer did not suspect passenger of criminal activity, the officer was permitted to

detain passenger while he investigated his fellow motorists for criminal activity); *United States v.*

*Starks*, 301 F. Supp. 2d 76, 82 (D. Mass. 2004) (citing *Moorefield* and holding that "an officer

may, consistent with the Fourth Amendment, detain a passenger during a traffic stop, even without

particularized reasonable suspicion that the passenger has committed any crime," because the

"same officer safety and personal liberty concerns apply to passengers" and drivers).

 *United States v. Vaughan,* 718 F.2d 332, 333 (9th Cir. 1983)*,* which predated *Wilson*,

involved a factual scenario similar to the present action.  The defendant in the case was a passenger

in a vehicle in which the driver and another passenger were wanted on arrest warrants; there was

no warrant for the defendant's arrest and the police were ignorant of his identity.  *Id.*  When the

police stopped the car in order to apprehend the wanted men, the defendant exited the vehicle and

attempted to walk away.  *Id.*  The police brought him back to the car, and handcuffed him when he

attempted to leave a second time.  *Id.*  The court held that, despite the lack of probable cause with

respect to the defendant, the police had authority "to detain him briefly to ascertain whether any evidence that might be located on the [wanted motorists] or in the car could incriminate him and to engage in a limited *Terry* [*v. Ohio*] 'stop and frisk' to determine that he had no weapons that might endanger the officers." *Id.* at 334. With respect to the length of the detention, the Court ruled that the police had authority to detain the defendant pending the search of the other occupants of the vehicle. *Id.* It reasoned that the stop "was not a routine traffic arrest of a driver of a vehicle;" rather, arrest warrants had been issued for two occupants of the vehicle, the officers had authority to search the passenger compartment of the car, and if the search turned up evidence to incriminate the defendant, he could have been arrested. *Id.* at 335. The detention was justified under the Fourth Amendment, therefore, based principally on the law enforcement interest "in preventing flight in the event that incriminating evidence was found in the car." *Id.* at 334. Further, the court noted that the detention minimized the risk of harm to the officers and facilitated the orderly search of the vehicle and its occupants. *Id.* at 335.

Here, the police officers stopped the Mountaineer, in the first instance, in order to arrest Aponte. It is clear that, under *Wilson*, they were entitled to order Morales out of the vehicle pending the completion of this task. *See Wilson*, 519 U.S. at 415. The issue is whether any subsequent detention was warranted under the Fourth Amendment. Resolution of this issue requires a consideration of whether it was reasonable, under the circumstances, to further infringe on the liberty of Morales. *See Wilson*, 519 U.S. at 411. In evaluating reasonableness, the Court must balance law enforcement interests against the nature and quality of the intrusion on Morales's personal freedom. *See id.*

The Court concludes that it was reasonable to pat-down and briefly detain Morales pending

the completion of the arrest of Aponte.[32]  The officers stopped the Mountaineer, not for a routine

traffic violation, but to execute an arrest warrant for Aponte stemming from assault and battery

charges.  *See Vaughan*, 718 F.2d at 335; *Clark*, 337 F.3d at 1288 (finding it notable that defendant

was associating with two persons being investigated for criminal activity); *compare Moorefield*,

111 F.3d at 13 (ratifying police conduct in detaining a passenger when the driver was suspected

only for a routine traffic stop); *Starks*, 301 F. Supp. 2d at 82 (same).  The arresting officers were

not unfamiliar with Morales; Officers Carmody and Lopez were members of the Worcester Police

Department gang unit, and Morales had previously admitted to both officers that he was affiliated

with a Worcester gang known as PVE.  Lopez and Carmody had also been involved in previous

arrests of Morales on firearms and narcotics charges.  When the officers approached the

Mountaineer, they both saw Morales leaning back toward Aponte as if to put something in the

back of the car, to give something to Aponte, or to receive something from Aponte.[33]

      In light of these circumstances, the limited pat-down of Morales was justified.  *See*

*Vaughan*, 718 F.2d at 334 (officers had a right to engage in a limited "stop and frisk" to determine

that the passenger had no weapons); *Moorefield*, 111 F.3d at 13 (observing that, under *Terry v.*

*Ohio*, 392 U.S. at 27, "many courts of appeals have upheld limited weapon pat-downs of

passengers where passengers have engaged in suspicious behavior"); *United States v. Fryer*, 974

---

[32] The Court notes that Lopez had discovered the drugs, and thus had probable cause to arrest Morales, even before the arrest of Aponte was complete.  Nonetheless, the officers *could* have detained Morales until Aponte was under arrest because the traffic stop would not have been complete until that point. *See, e.g., Starks*, 301 F. Supp. 2d at 82 ("A Fourth Amendment violation occurs when the detention extends beyond the valid reason for the stop").

[33] Carmody knew that Morales was the individual in the front seat at this point.  It is unclear if Lopez had recognized Morales as the front seat passenger, although he knew that the Morales and Aponte were somewhere in the Mountaineer.

F.2d 813, 819 (7th Cir. 1992) (pat-down of driver and passenger pursuant to a routine vehicle stop was justified where "the officer observed furtive movements between the driver and the passenger, as if they were passing something between them").[34]

The officers also had a strong law enforcement interest in detaining Morales pending the arrest of Aponte. Most notably, the detention prevented him from fleeing in the event that a search incident to the lawful arrest of Aponte turned up evidence to incriminate Morales. *See* Vaughan, 718 F.2d at 334-335 (reaching the same holding where the officers did not know the identity of the passenger or his criminal history, or witness any furtive movements between the passenger and the motorists wanted on arrest warrants). It also minimized the risk of harm to the officers and allowed them to maintain control of the situation and conduct the traffic stop in an orderly fashion. *See Rogala*, 161 F.3d at 53; *Vaughan*, 718 F.2d at 334-335.

On the other side of the balance, the additional intrusion on Morales's personal liberty was relatively minor. The Mountaineer had already been lawfully stopped and Morales had already been lawfully ordered out of the vehicle. *See Kimball*, 25 F.3d at 5; *Wilson*, 519 U.S. at 415. The only change in Morales's circumstances as a result of the ensuing detention was that he was forced to remain in a particular location outside the vehicle for the short time that it took to take custody of Aponte. *See Wilson*, 519 U.S. at 414; *Moorefield*, 111 F.3d at 13.[35] Under the circumstances, "the benefit of added officer protection far outweigh[ed] this minor intrusion." *Moorefield*, 111

---

[34] In any event, the legality of the pat-down may be immaterial because it turned up no contraband or inculpatory evidence. It also appears to be irrelevant to any inculpatory statements made by defendant at the scene or at the police station; defendant alleges that the incriminating statements were the fruit of the unlawful detention, not the pat-down.

[35] The detention could not have lasted longer than a few minutes, because the record suggests that only five to seven minutes elapsed between the stop of the Mountaineer and the arrest of Morales. 1-54.

F.3d at 13; *see Wilson*, 519 U.S. at 414.  Thus, although the police had no particularized suspicion that Morales was involved in criminal conduct when they initially stopped the Mountaineer, they were authorized under the Fourth Amendment to detain him while they carried out the purpose of the traffic stop.  *See Starks*, 301 F. Supp. 2d at 82.

**(2)     Independent Constitutional Basis to Pat-Down and Temporarily Detain Morales**

In *Terry v. Ohio*, the Supreme Court held that law enforcement may, in some circumstances, initiate investigatory detentions, consisting of a brief seizure that falls short of full-scale arrest and a limited pat-down search of the suspect's outer clothing.  392 U.S. at 22-24.  These encounters, known as "*Terry* stops," are justified when circumstances give rise to a reasonable suspicion of criminal activity.  *Id.* at 20.  Reasonable suspicion must be based on "specific and articulable facts," taken together with rational inferences which the officer is "entitled to draw from the facts in light of his experience."  *Id.* at 20, 27.  A police officer's "inchoate and unparticularized suspicion or hunch" will not support a *Terry* stop.  *Id.* at 27.  Recognizing that traffic stops are dangerous occurrences that can result in violence against police officers, the Court has applied the constitutional principles promulgated in *Terry* to situations involving officers and motorists.  *See, e.g., United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975); *Michigan v. Long*, 463 U.S. 1032, 1047 (1983).

A *Terry* stop that is reasonable at its inception may nonetheless violate the Fourth Amendment by virtue of its subsequent intensity and scope; the scope of the stop and search must be closely tied to and justified by the circumstances that rendered its initiation permissible.  *Terry*, 392 U.S. at 18-19.  The reviewing court must therefore determine, not only whether there was a

28

proper factual predicate for the *Terry* stop, but also whether the action taken was reasonably related in scope to the circumstances that justified the interference in the first place. *Kimball*, 25 F.3d at 6. In this endeavor, the court must consider the totality of the circumstances that confronted the officer, and employ "a practical, commonsense approach." *United States v. Sowers*, 136 F.3d 24, 28 (1st Cir. 1998). Although there is no "bright-line" rule to determine when an investigatory detention becomes an unlawful arrest, courts take account of its length, the restrictions placed on the suspect's movement, the force (if any) that was exerted, the information conveyed to the detainee, and the severity of the intrusion. *See Sharpe*, 470 U.S. 675, 687-688 (1985); *Sowers*, 136 F.3d at 28.

The First Circuit has recognized that a police officer's suspicions may become transformed in the course of a traffic stop, and justify detention of passengers beyond the point when the suspicions which originally gave rise to the traffic stop have been allayed. *Sowers*, 136 F.3d at 27-28. In *Sowers*, the officer had originally stopped a vehicle for certain equipment violations. *Id.* at 25. During the encounter, the passenger was unable to produce personal identification, and both the driver and passenger appeared nervous. *Id.* The officer instructed the passenger to exit the vehicle and ordered the driver to remain seated in the car. *Id.* While separated, the motorists gave conflicting accounts of the extent, purpose, and details of their travels. *Id.* The driver produced a license and registration, and the officer verified the validity of these documents as well as the identity of the passenger. *Id.* However, he remained suspicious of the motorists and requested consent to search the vehicle, which the passenger (and owner of the vehicle) initially denied. *Id.* The passenger relented when the officer threatened to summon a narcotics dog to perform a sniff-search. *Id.* at 25-26. While awaiting back-up, the officer conducted a pat-down search of the

passenger, which turned up narcotics in her jacket pocket. *Id.* at 26. The discovery incriminated the driver because the passenger was wearing his jacket. *Id.*

The driver challenged the detention on the grounds that it became unlawful under the Fourth Amendment after the initial purpose of the traffic stop was carried out – that is, after the officer confirmed the validity of the license and registration. *Id.* The court rejected this argument, holding that "the actions undertaken by the officer following the stop were reasonably responsive to the circumstances justifying the stop in the first place, as augmented by information gleaned by the officer during the stop." *Id.* at 27. It explained that, as the vehicle stop progressed, "the trooper's attention (and, thus, his reasonable suspicion) shifted away from the equipment violation toward a belief that the detainees were engaged" in criminal misconduct. *Id.* As required under *Terry*, the officer articulated particularized factual bases for the suspicion: the passenger's inability to confirm her identity, the nervousness of both motorists, and their inconsistent stories. *Id.* Thus, the trooper had an adequate factual justification to prolong the stop beyond the point at which the driver produced the requested documentation. *Id.* at 28.

The Court also found that the ensuing detention was reasonably responsive to the officer's transformed suspicions, and therefore, that the *Terry* stop did not become a *de facto* arrest. *Id.* at 28. It noted that the restriction on the driver's movement – namely, the trooper's instruction that he remain in the vehicle – was not onerous. *Id.* The court also deemed the thirty-minute interval between the stop and the discovery of contraband reasonable under the circumstances. *Id.*; *see also United States v. Quinn*, 136 F.3d 153, 157 (1st Cir. 1987) ("there is no talismanic time beyond which any stop initially justified on the basis of *Terry* becomes an unreasonable seizure under the Fourth Amendment").

Here, the identification of Aponte as a passenger formed the original basis for the stop of the Mountaineer, and there is no dispute that a vehicle stop was justified in order to execute an arrest warrant for one of the passengers. As the vehicle stop progressed, the officers began to suspect Morales of criminal conduct as well as Aponte. This shift in suspicion was prompted by the observation of Morales turning back toward Aponte as the officers approached the Mountaineer.[36] It appeared to Officers Carmody and Lopez that Morales was putting something in the back seat or giving something to Aponte or receiving something from him. The apparently furtive movements between the front and back seat passengers would alone suffice to augment or transform the suspicions that justified the traffic stop at its inception, particularly where one passenger is wanted on an arrest warrant for a violent offense. *See Vaughan*, 718 F.2d at 334; *Fryer*, 974 F.2d at 819.

In addition to the apparently furtive movement, the officers' previous experience with the passengers of the vehicle fueled their suspicions of criminal activity on the part of Morales. *See Terry*, 392 U.S. at 27 (stating that, "in determining whether the officer acted reasonably, due weight must be given . . . to the specific inferences which he is entitled to draw from the facts in light of his experience"). Officers Carmody and Lopez worked in the Worcester Police gang unit, and Morales had previously confessed his membership in the PVE gang to both officers; the PVE gang was known for its involvement with illegal firearms and narcotics. 1-64, 1-65, 1-71, 1-72. Officers Carmody and Lopez had also been involved in previous arrests of Morales on narcotics and firearms charges, and in arrests of Aponte on narcotics charges. 1-63, 1-65, 1-87. Thus,

---

[36] Officer Lopez testified that he feared for his safety when he witnessed the movement between the front and back seat passengers. 1-75.

given the totality of the circumstances, the officers had a particularized factual basis to suspect that

Morales was involved in criminal activity, either on his own or in partnership with Aponte. *See,*

*e.g., Sowers*, 126 F.3d at 27-28 (reasonable suspicion based on nervousness and conflicting

stories); *compare Ybarra v. Illinois*, 444 U.S. 85, 91 (1970) ("person's mere propinquity to others

independently of suspected criminal activity does not, *without more*, give rise to probable cause to

search that person) (emphasis added); *United States v. Davis*, 94 F.3d 1465 (10th Cir. 1996)

(police officer's "[k]nowledge of defendant's prior criminal record is not, *standing alone*, sufficient

to create reasonable suspicion") (emphasis added).

    Having found that facts existed to give rise to a reasonable suspicion of Morales, the Court

must examine whether the scope of the ensuing investigatory detention was reasonably related to

the circumstances that originally justified the suspicion. *Terry*, 392 U.S. at 18-19; *Kimball*, 25

F.3d at 6. As required under *Terry*, the search was limited to a pat-down of Morales's outer

clothing for weapons. *See* 392 U.S. at 27. When the frisk was complete, Lopez instructed

Morales to "wait" or "stand" in some unspecified location, and Morales walked on to a position

approximately five to eight feet away. This restriction on Morales's movement was not

particularly onerous; it was arguably less burdensome than confinement to the interior of a vehicle.

*Compare Sowers*, 136 F.3d at 28. Officer Vo watched Morales from a short distance, but he was

not closely guarded. The police did not deploy any physical force against Morales or use any

intimidating tactics once the frisk was complete; he walked a few feet away on his own volition

and he was not handcuffed or otherwise restrained at that point. The investigatory detention lasted

only until Officer Lopez discovered the drugs, at which point the officers had probable cause to

arrest Morales. This was a very brief time frame of anywhere from several seconds to perhaps as

long as a minute or two. *Compare id.* (thirty-minute investigatory detention was not unreasonable under Terry).

Under the circumstances, the scope of the investigatory detention of Morales was reasonably responsive to the officers' suspicions: it allowed the officers to ensure that Morales carried no dangerous weapons, and afforded them the opportunity to ascertain whether evidence in the vehicle or on Aponte's person incriminated Morales. *See Vaughan*, 718 F.2d at 334-335. Therefore, events that transpired after the vehicle stop gave the police officers an independent Fourth Amendment basis to frisk and briefly detain Morales.

**C.    Applicability of State Constitutional Guarantees**

Article XIV of the Massachusetts Constitution forbids police officers from ordering a passenger out of a vehicle without a reasonable belief that the officer's safety or the safety of others is in danger. *Commonwealth v. Gonsalves*, 429 Mass. 658, 662-663 (1999). It is therefore more restrictive of law enforcement than the Fourth Amendment, which permits a police officer to order a passenger out of a vehicle *without* reasonable suspicion. *See Wilson*, 519 U.S. at 415.

Defendant argues that the police officers violated Article XIV of the Massachusetts Constitution by removing him from the Mountaineer without reasonable suspicion, and that this unlawful conduct lead to his subsequent inculpatory statements. Thus, he maintains, the statements should be suppressed as the fruit of unlawful police conduct.

The foregoing argument is premised on the theory that the Court may apply state constitutional guarantees in federal criminal prosecutions. However, the First Circuit has "consistently adhered to th[e] rule" that "federal law governs federal prosecutions in federal court." *United States v. Sutherland*, 929 F. 2d 765, 769 (1st Cir. 1991). There are no exceptions

33

to this rule.  *Id.* at 770-771.  Only in the "extreme case of flagrant abuse of the law by state officials, where federal officials seek to capitalize from on that abuse," might a federal court choose to exercise its inherent "supervisory powers" to exclude evidence obtained in violation of state law.  *Id.* at 770.

Accordingly, Massachusetts constitutional provisions do not govern the present matter, and provide no grounds for exclusion of evidence.

*    *    *

In summary, the Court concludes that the police officers did not violate the Fourth Amendment, either by stopping the Mountaineer in the first instance, or by patting-down and briefly detaining Morales thereafter.  The subsequent statements by Morales are not the fruit of an illegal search or seizure, and therefore there are no grounds to suppress those statements, or any other evidence obtained at the scene of the vehicle stop or at the Worcester Police Station.

**Order**

For the reasons stated in the foregoing memorandum, defendant's motion to suppress is

DENIED.

**So Ordered.**


/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: February 22, 2005